495 So.2d 135 (1986)
Donald William BROOKINGS, Appellant,
v.
STATE of Florida, Appellee.
No. 64221.
Supreme Court of Florida.
August 28, 1986.
Rehearings Denied October 28, 1986.
*137 Samuel R. Mandelbaum of Smith and Williams, P.A., Tampa, for appellant.
Jim Smith, Atty. Gen., and Katherine V. Blanco, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Donald William Brookings appeals his conviction for first-degree murder and the imposition of a sentence of death. We have jurisdiction, article V, section 3(b)(1), Florida Constitution. We affirm the conviction, but vacate the sentence and remand with directions.
In November 1978, during a barroom fight in Tampa, Irwin Ballard allegedly stabbed several persons. One of those victims died. Earl Sadler witnessed this murder. Shortly thereafter, Ballard's mother, Mrs. Cecil Murray, claimed to have received threats against her family and property which she attributed to Sadler. In March 1980, Murray hired Brookings for $5,000 to kill Sadler in order to prevent Sadler from testifying against her son. On April 11, 1980 Brookings and his girlfriend, Judith Lowery, went to Sadler's home driving a car owned by Murray. Lowery testified at trial that she backed the car into Sadler's driveway and induced Sadler to come outside to help her on the pretext that her car would not start. While Sadler was in front of the car (evidently inspecting the engine) Brookings shot Sadler dead. Lowery drove over the victim's body as they left the murder scene.
There were no leads as to who committed this murder until over a year later when Lowery, incarcerated on unrelated felony charges, sent her attorney to the state in order to get a "deal" for herself. This deal was consummated in June 1981 and gave Lowery total immunity for her participation in the Sadler killing in exchange for her truthful testimony against appellant. After entering into the immunity agreement, Lowery provided the state with the information implicating Brookings and Murray who were charged with the homicide. Subsequently, Murray entered a plea of nolo contendere to second-degree murder in exchange for a life sentence and her truthful testimony against appellant. Murray filed a motion to mitigate her life sentence and after a hearing following the trial herein, her life sentence was reduced to twenty years.
The jury found appellant guilty of first-degree murder and recommended life imprisonment. The trial court sentenced appellant to death after finding three non-statutory mitigating, and five statutory aggravating, circumstances.
Appellant challenges his conviction and sentence on twelve grounds. First, appellant claims that it was error for the trial court to deny his motion pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for production of the grand jury testimony of lead detective Nelms and witness Lowery. According to appellant, there were certain inaccuracies and conflicts "of a material nature" between these witnesses' depositions and Nelms' original criminal affidavit. This, claims appellant, justified at least an in camera inspection of the grand jury testimony by the trial court to determine if it would be useful to the defense.
We have previously held that there is no pretrial right to inspect grand jury testimony. Jent v. State, 408 So.2d 1024 (Fla. 1981) (citing Minton v. State, 113 So.2d 361 (Fla. 1959)), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982). While holding an in camera inspection of such testimony is within the discretion *138 of the trial court, see State v. Drayton, 226 So.2d 469 (Fla.2d DCA 1969), the facts presented sub judice make our decision in Jent controlling. In Jent we held "[m]ere surmise or speculation regarding possible inconsistencies in testimony" was not enough to require the production of grand jury testimony. 408 So.2d at 1027. The United States Supreme Court recently reaffirmed the importance of maintaining the secrecy of grand jury proceedings and held that a party seeking disclosure must make a strong showing of a particularized need in order to outweigh the public interest in secrecy. United States v. Sells Engineering, Inc., 463 U.S. 418, 443, 103 S.Ct. 3133, 3148, 77 L.Ed.2d 743 (1983). In an attempt to show such a particularized need, appellant enumerates several instances of alleged inconsistencies between the grand jury testimony of Nelms and Lowery and their subsequent depositions. But we find here, as we did in Jent, that appellant's counsel, through cross-examination at trial of both Lowery and Nelms, was able to direct the jury's attention to any purported inconsistencies between the witnesses' trial testimony and their prior depositions, thus obviating any need for resort to the grand jury testimony.
Appellant's next claim concerns the contract of immunity between the state and Lowery which was introduced into evidence without defense objection. In addition to requiring Lowery to testify truthfully at appellant's trial, the contract required Lowery to submit to a polygraph examination if requested by the state. Defendant made no request to excise or remove that provision from the document. At trial the prosecution asked Lowery if she had lived up to the contract and testified truthfully to which Lowery answered affirmatively. There was no specific mention of the polygraph. During a defense proffer, appellant attempted to question detective Nelms as to whether he had given Lowery a polygraph exam. Upon determining that Nelms had no personal knowledge of this fact, the trial judge prohibited questioning Nelms on this point in front of the jury as Nelms' testimony would not be relevant.
Although results of a polygraph examination are inadmissible as evidence, Sullivan v. State, 303 So.2d 632 (Fla. 1974), cert. denied, 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976); Kaminski v. State, 63 So.2d 339 (Fla. 1952), they may be admitted into evidence by stipulation or waiver by the parties. Delap v. State, 440 So.2d 1242 (Fla. 1983), cert. denied, 467 U.S. 1264, 104 S.Ct. 3559, 82 L.Ed.2d 860 (1984). The gravamen of appellant's complaint is that the state, by introducing the contract of immunity into evidence, created an inference that Lowery had taken and passed a polygraph, thus bolstering her credibility with the jury. Having substantially benefited from this inference, appellant concludes, the state waived its right to object to the defense's questioning of Nelms on this point.
If the prosecution had elicited explicit testimony from Lowery concerning the polygraph examination there might be some basis for appellant's position but this did not happen here. See Bollinger v. State, 402 So.2d 570 (Fla. 1st DCA 1981); Kaminski.
In Sullivan, one of the state's key witnesses testified that he would "have to have taken a polygraph test and passed it" under his plea agreement. The witness made only this one reference to a polygraph in front of the jury. The state admitted that it intended to elicit this reference to a polygraph exam. 303 So.2d at 634. While condemning such prosecutorial conduct, this Court nevertheless held the error to be harmless, stating:
We cannot know how the jury construed his answer, or what weight was given to it; therefore, to assert that it was construed as meaning that he had already passed it would be pure speculation on our part. Reversible error cannot be predicated on conjecture.
Id. at 635 (citation omitted).
In the case at bar, the only reference to a polygraph exam was within Lowery's contract of immunity introduced into evidence. The contract itself called for a *139 polygraph exam if requested by the state. These two facts lend themselves to various possible inferences which the jury could have drawn. It would be pure conjecture on our part as to which one the jury drew. We conclude that this is too tenuous to support a finding of harmful error.
Appellant's next contention is that it was error for the trial court to restrict his examination of Lowery and her attorney as to the allegedly different version of the Sadler murder Lowery gave her attorney before he approached the state seeking a plea bargain. Appellant's theory is that Lowery, by sending her attorney to the state, and by testifying at trial, waived her attorney-client privilege.[1] We disagree.
Various reasons have historically been cited for the existence of the attorney-client privilege. The modern view is that the privilege promotes the administration of justice by "encouraging clients to lay the facts fully before their counsel." McCormick's Handbook of the Law of Evidence § 96 (E. Cleary 2d ed. 1972). By encouraging full disclosure, a client is able to receive fully informed legal advice without the fear that his statements may later be used against him. As the United States Supreme Court has observed:
As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice.
Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).
This Court has said that:
The attorney-client privilege arises in the context of a relationship having great significance for the protection of fundamental personal rights. For example, the ability to speak freely to one's attorney helps to preserve rights protected by the fifth amendment privilege against self-incrimination and the sixth amendment right to legal representation.
Mills v. State, 476 So.2d 172-176, (Fla. 1985), cert. denied, ___ U.S. ___, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986).
Appellant's contention that Lowery's testimony against appellant waived her attorney-client privilege is erroneous. We hold that the mere fact that a witnessclient testifies to facts which were the subject of consultation with counsel is no waiver of the privilege. It is the communication with counsel which is privileged, not the facts. See, e.g., Magida v. Continental Can Co., 12 F.R.D. 74 (S.D.N.Y. 1951); Shelly v. Landry, 97 N.H. 27, 79 A.2d 626 (1951); see also McCormick's Handbook of the Law of Evidence, supra, § 93. Likewise, we reject appellant's claim that Lowery waived her attorney-client privilege by sending her attorney to the state in pursuit of a "deal." The record indicates that Lowery's communications with her attorney were not made in the presence of third parties, thus waiving her privilege. See United States v. Blackburn, 446 F.2d 1089 (5th Cir.1971) (waiver of the privilege when alleged privileged communication between former attorney and client was made in the presence of trial counsel and government attorneys), cert. denied, 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972). It is obvious from the record that Lowery fully intended that her communications with her attorney be kept confidential as the trial court correctly recognized.
Although evidently a question of first impression in Florida, the Supreme Court of Mississippi in Young v. State, 425 So.2d 1022 (Miss. 1983), rejected an identical claim. In Young the appellant attempted to cross-examine the attorneys of two witnesses about discussions the attorneys had with their clients concerning grants of leniency in exchange for their trial testimony against appellant. The court rejected this attempted invasion of the attorney-client privilege and noted that the attorneys did answer questions concerning the existence of any deal that their clients had with the state, but said that the attorneys had properly *140 refused to answer questions concerning discussions with their clients. Id. at 1028.
We reach the same conclusion here. Lowery's statements to the state after entering into the contract of immunity were summarized by Nelms, and both Nelms and Lowery were questioned extensively by the appellant through depositions and at trial concerning Lowery's original statements. The trial court's only restriction on these questions at trial concerned the confidential communications between Lowery and her attorney. This narrow restriction was entirely proper and in line with our holding here that no waiver of the privilege occurred simply because Lowery had her attorney negotiate immunity with the state. Other jurisdictions that have faced similar claims are in accord with this holding. See, e.g., Chicola v. State, 253 Ga. 773, 325 S.E.2d 379 (1985) (questioning witness extensively about her plea bargain obviates any reason to inquire into discussions with her attorney); State v. Rankin, 465 So.2d 679 (La. 1985) (plea bargain itself not privileged, but what bargain client told attorney he wanted to make is privileged); State v. Dixon, 668 S.W.2d 123 (Mo. Ct. App. 1984) (witness's admission of the existence of a plea bargain does not waive the privilege); Littlefield v. Superior Court, 136 Cal. App.3d 477, 186 Cal. Rptr. 368 (Cal.Ct.App. 1982) (no waiver when immunized witness testifies as to the same topics discussed privately with his attorney; grant of immunity itself is grounds for attacking the witnesses credibility); Call v. McKenzie, 159 W. Va. 191, 220 S.E.2d 665 (1975) (defense attorney should set forth for the record terms of his client's plea bargain and reasons he advised client to plead guilty to the extent this does not violate the privilege).
Our holding on this point also settles appellant's next claim which is that he was unduly restricted in cross-examining witness Murray as to Murray's "true interest" in testifying against appellant. Our review of the record indicates that the only restriction of cross-examination concerned discussions between Murray and her attorney. It was brought out at trial that Murray pled no contest to second-degree murder in exchange for a life sentence and her truthful testimony at appellant's trial. During a defense proffer, appellant attempted to show that a motion to mitigate Murray's sentence had been filed by her attorneys and that Murray's motive for testifying against appellant was for a reduction of her life sentence. Although Murray's sentence was ultimately reduced from life to twenty years subsequent to appellant's trial, the jury was made aware of Murray's role in this murder and of the terms of her plea bargain with the state. Further, defense counsel made the jury aware of Murray's expectations as to her ultimate sentence through the following colloquy:
Q. (By Defense): Mrs. Murray, isn't it true that you do not expect to serve a life sentence for your plea in this case?
A. (By Murray): I do not expect to do what?
Q. To serve a life sentence for your plea in this case?
A. I don't know how much I am going to serve.
While a criminal defendant has a constitutional right to expose on cross-examination a witnesses' motivation in testifying, Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Steinhorst v. State, 412 So.2d 332 (Fla. 1982); Roberts v. State, 164 So.2d 817 (Fla. 1964), this does not extend to conversations a witness has with her attorney. Mills v. State, 476 So.2d 172 (Fla. 1985), cert. denied, ___ U.S. ___, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986). We find that Murray's motive for testifying here was exposed to the jury and that the trial court properly prohibited appellant from questioning Murray about privileged conversations she had with her attorneys.
Appellant next contends that he was not allowed to question Murray about a "false statement" arrest which occurred three years prior to this trial that appeared on Murray's "rap sheet." The document did not show the disposition of the charge. Section 90.610(1), Florida Statutes (1983) *141 allows a party to impeach a witness with evidence showing that the witness was convicted of a crime involving dishonesty or false statement. A party may impeach by questioning about pending charges only if they arise out of the same episode for which the defendant is charged. See, e.g., Fulton v. State, 335 So.2d 280 (Fla. 1976). The record shows that the charge at issue here was made prior to the state's charges against Murray arising from the Sadler murder. Absent evidence that the charge arose from the Sadler murder, we find the trial court did not abuse its discretion by prohibiting inquiry on this point.
Appellant's next allegation of error is that the state improperly impeached its own witness. The witness, Powell, was employed by Murray, and had originally given the state a false sworn statement concerning the facts of this case. This statement earned Powell a perjury charge which was later dropped when Powell agreed to testify truthfully. On direct examination by the state, the prosecutor elicited from Powell the fact that he had been arrested for perjury and explored the circumstances surrounding the charges. We find, under the circumstances presented here, that this prior inconsistent statement was used to buttress, not impeach, the credibility of the state's own witness and, used as such, it was not in violation of section 90.608(1)(a), Florida Statutes (1983). Bell v. State, 491 So.2d 537 (Fla. 1986).
Appellant next contends that the prosecution coerced Powell into giving incriminating testimony against appellant by threatening him with a perjury charge. The record reveals that this claim is without merit. Powell testified that he did not want to go to jail for perjury and he agreed to tell the prosecution everything he knew. We have recently rejected a similar claim of coercion where the prosecutor emphasized to a recalcitrant witness the importance of telling the truth. Burr v. State, 466 So.2d 1051 (Fla.), cert. denied, ___ U.S. ___, 106 S.Ct. 201, 88 L.Ed.2d 170 (1985).
Appellant's final claim of error occurring during the guilt phase concerns the failure of the trial court to sequester the jury. The record reveals that the case was initially submitted to the jury shortly after 9:00 p.m. At that point, the trial court discussed with the state and defense what should be done with the alternate juror, and informed the parties that he did not intend to sequester the jury. After the jury had been deliberating almost three hours, the court inquired of both the state and the defense as to how to proceed. The state responded: "I will leave that to the discretion of the Court, Judge." Defense counsel, after conferring with the defendant, stated: "Whatever the Court desires, your Honor. We will go with that." The court further inquired as to whether there was any objection to recessing until 9:30 a.m. the next morning, to which the defense responded: "No, your Honor." Appellant contends that he is entitled to a new trial pursuant to our decision in Livingston v. State, 458 So.2d 235 (Fla. 1984). We disagree, and find under the facts presented here, our decision in Engle v. State, 438 So.2d 803 (Fla. 1983), cert. denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 753 (1984), is controlling. In Engle we held that failure to sequester the jury was not a denial of due process or fair trial rights when defense counsel was consulted and agreed to the jury's separation, and when the trial court admonished the jury to neither discuss the case with anyone nor expose themselves to media accounts of the trial. Id. at 808. Sub judice, after the jury had been deliberating for approximately three hours, the trial court invited input from the state and the defense on how best to proceed. Defense counsel's response of, "whatever the Court desires," can only be viewed as acquiescence in the trial court's announced intention not to sequester the jury. Once the jury was discharged for the evening, the court inquired whether the parties wished to place anything on the record, to which the defense indicated in the negative. This same colloquy was repeated the following morning, prior to the jury being sent out to continue their deliberations, *142 with the same response from defendant's counsel. A defendant cannot acquiesce to such a procedure and then claim reversible error upon appellate review.
Further, prior to sending the jury home for the evening, the trial judge thoroughly admonished the jury not to discuss the case amongst themselves or with anyone else, nor to expose themselves to any media accounts of the trial. Additionally, the court reinstructed the jury that if anyone attempted to contact them about the case, they were to inform the court. The following morning, the trial judge questioned the jury to ensure that each of his admonitions had been obeyed. The jury informed the court that they had not discussed the case with each other or anyone else, nor been exposed to accounts of the case from the media or any other source. Our review of the record leads us to conclude that appellant's right to receive a fair trial was not compromised.[2]
Finding no reversible error during the guilt phase, we therefore affirm appellant's conviction of first-degree murder.
Appellant challenges the judge's override of the jury's recommendation that appellant be sentenced to life imprisonment with no possibility of parole for twenty-five years. The trial court found five aggravating circumstances,[3] and three non-statutory mitigating factors:
1. Appellant saw his father commit suicide when appellant was four years old.
2. Despite hiring appellant to kill Sadler, Murray was able to avoid a death sentence by pleading no contest to second-degree murder.
3. Despite active participation in this killing, Lowery received total immunity.
The jury's recommendation is entitled to great weight. In order to uphold a judge's override of the jury's recommendation, the facts justifying a death sentence must be so clear and convincing that no reasonable person could differ. Tedder v. State, 322 So.2d 908 (Fla. 1975).
It is clear from our review of the record in this case that the jury's recommendation of life was based on the disparate treatment accorded Murray and Lowery. Appellant's counsel's closing argument during the penalty phase centered almost exclusively on the role Murray and Lowery played in this murder and the different treatment given to these two when compared with the penalty sought against appellant. The trial court, by finding the disparate treatment as mitigating factors, recognized that the treatment of Lowery and Murray were reasonable factors to consider. We are presented here with a factual picture arising from the not infrequent difficult choices confronting prosecuting authorities when deciding who to prosecute and who to plea bargain with. In this case, the testimony of Lowery and Murray was essential to ensure a conviction against appellant. We are not critical of the state's strategic decision here to strike "deals" with Lowery and Murray in order to ensure a conviction against a violent criminal who would murder another human being for money. This kind of deal making is simply *143 a fact of life in our criminal justice system. The issue before us is whether it was reasonable for this jury to consider the treatment given Murray and Lowery when determining what sentence to recommend to the trial court.
This Court has upheld a jury recommendation of life which could have been based, to some degree, on the treatment accorded another equally culpable of the murder. See, e.g., McCampbell v. State, 421 So.2d 1072 (Fla. 1982). We have also held that a jury may not compare treatment of those guilty of a different, lesser crime when weighing the propriety of the death penalty. Eutzy v. State, 458 So.2d 755 (Fla. 1984), cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985).
We find here that the jury could reasonably consider the treatment of Lowery and Murray and therefore, under the Tedder standard, the trial court's override was improper. The jury heard both Lowery and Murray testify about their roles in this homicide. Murray testified that she hired appellant to kill Sadler in order to protect her son from murder charges, and provided appellant and Lowery with money, lodging and transportation both before and after Sadler was killed. Lowery testified that she helped appellant purchase the murder weapon and ammunition, helped devise the plan to lure Sadler from his home in order for appellant to ambush the victim, drove Murray's car to and from the murder scene and ran over Sadler's body after the killing was accomplished. In short, although appellant pulled the trigger, Murray and Lowery were also principals in this contract murder, helping to plan and carry out this crime. That Murray would escape any chance of the death penalty and that Lowery would walk away totally free while the ultimate penalty was sought against appellant, are facts that could reasonably be considered by the jury. Since reasonable people could differ as to the propriety of the death penalty in this case, the jury's recommendation of life must stand.
Therefore, we affirm appellant's conviction for first-degree murder, vacate the sentence of death and remand this cause to the trial court for imposition of a sentence of life imprisonment without eligibility of parole for twenty-five years.
It is so ordered.
McDONALD, C.J., and ADKINS, OVERTON, EHRLICH and SHAW, JJ., concur.
BOYD, J., concurs in part and dissents in part with an opinion.
BOYD, Justice, concurring in part and dissenting in part.
I concur in the affirmance of the conviction but dissent to the reduction of sentence.
I believe that the practice of allowing jurors to disperse after they have commenced deliberations in the trial of a capital case is so inherently prejudicial that I am almost, but not quite, prepared to say that it is fundamental error, reversible on appeal without regard to whether the defense objected to it at trial. An alternative way of reaching the issue might be to hold that the failure of defense counsel to object was ineffective assistance of counsel, violative of the defendant's constitutional rights under the sixth and fourteenth amendments. However, under the circumstances of this case I agree with the Court that the conviction may be upheld despite the existence of facts held to constitute reversible error in Livingston v. State, 458 So.2d 235 (Fla. 1984).
In Livingston v. State, we said that a capital trial jury should be sequestered after commencing deliberations unless there are exceptional circumstances compelling that they be allowed to separate. In the present case, when the jury indicated late at night that it had not reached a verdict, no arrangements had been made for the jurors' overnight lodging and so it was necessary to allow them to go to their homes. However, defense counsel and the court should have anticipated the eventuality and sought and made arrangements for overnight sequestration in advance of the trial. Because the trial was otherwise fair, *144 because the defense did not object but rather agreed, because it would have been burdensome to arrange lodging on short notice, and because the evidence of guilt was overwhelming, I am willing, reluctantly, to concur in the Court's affirmance of the conviction of first-degree murder.
Regarding the sentence of death, I dissent to the Court's reduction of the sentence to life imprisonment because the sentence of death is entirely appropriate under the law. The evidence showed a fully intentional, premeditated murder. It was a contract murder, committed in a cold and calculated manner for pecuniary gain by a several-times previously convicted violent felon. The mitigating factors found by the court or otherwise arguably present carried little weight and were entitled to little or no consideration in the sentencing process. The jury's recommendation of life was not based on any valid, reasonable mitigating factor. In fact, the recommendation appears to have been produced by allowing the jury to be influenced by irrelevant matters having no proper bearing on the sentencing decision.
The evidence showed that appellant was the actual perpetrator of the murder. He was not merely an accomplice whose participation was relatively minor compared with the actions of other participants. He did not act under the domination of another. The fact that the procurer of the murder, a principal but not a personally present participant, was allowed to plead guilty to second-degree murder and received a prison term, has no bearing on the question of what is the appropriate sentence for appellant. The fact that appellant's accomplice who was present at the murder scene and an equally guilty principal received total immunity in exchange for testimony is also no valid factor to be considered in determining appellant's punishment.
In Hoffman v. State, 474 So.2d 1178 (Fla. 1985), there was a similar factual situation to that in the present case. There the defendant was found guilty of first-degree murder, the evidence having shown a murder-for-hire situation. The procurer of the murder was convicted and received life in prison. An accomplice, equally guilty with defendant of intentional murder, also received life in prison. A co-conspirator who had recruited the murderers on behalf of the procurer was granted total immunity and testified for the state at trial. Evidence of this varied treatment of the equally guilty co-conspirator, procurer, and accomplice was placed before the jury and the sentencing judge. They were apparently unimpressed as the jury recommended and the judge imposed the sentence of death. On appeal the appellant argued that the death penalty was inappropriate for him in view of the disparate treatment of his accessories. This Court rejected the argument and affirmed the sentence of death.
The only difference between Hoffman and the present case is that here the jury recommended life imprisonment. The majority here holds that the disparate treatment of those equally guilty in view of the law provides a reasonable ground for the jury recommendation, thus obliging the sentencing court to follow it. The question that naturally arises is: under what standards are juries to determine that such factor is a valid mitigating circumstance in one case but is entitled to no weight in another? If the evaluation of this factual element is to be left to the unguided, subjective judgment of the jury, with this Court holding that the existence of the circumstance in question is sufficient to render a jury recommendation of life binding on the court, do we not sanction the exercise of unfettered jury discretion in violation of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)? Other examples raising the same question when compared to this case are Straight v. State, 397 So.2d 903 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981), and Palmes v. State, 397 So.2d 648 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981). There a co-conspirator received total immunity. Some evidence showed this accomplice to be the prime mover of the entire criminal plan. Neither the jury, the judge, nor this Court *145 on appeal found the disparate treatment to be a compelling factor in mitigation.
The capital felony sentencing law, while it provides for a jury recommendation as to sentence, reposes final sentencing authority in the judge, not the jury, because capital sentencing is more a matter of applying the law than it is a matter of finding facts. The judge, having studied the law, is better able to compare the capital felony to other capital felonies than is the jury, which has only "studied" one case. We have indicated on numerous occasions that the judge not only may but must overrule the jury when its recommended sentence is not the appropriate sentence under the law. See, e.g., Mills v. State, 476 So.2d 172 (Fla. 1985), cert. denied, ___ U.S. ___, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986); Stevens v. State, 419 So.2d 1058 (Fla. 1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983); Dobbert v. State, 375 So.2d 1069 (Fla. 1979), cert. denied, 447 U.S. 912, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980). In Stevens v. State the jury recommended life and there was conflict in the evidence as to which of two joint perpetrators was the dominating force and which one the actual killer. This Court held that the judge properly overruled the life recommendation.
Bargains offered or struck, leniency granted for testimony or otherwise, questionable prosecutorial determinations of relative culpability, these and other factors relating to the treatment of accomplices to capital felonies have no bearing on the circumstances of the offense or the character of the offender. One who gets what he deserves under the law has no standing to complain that someone else has received more or less than he or she deserves. As I stated in dissent to this Court's decision in Malloy v. State, 382 So.2d 1190 (Fla. 1979), consideration of the leniency given to equally guilty co-participants "contributes not to consistency" in capital sentencing," but to inconsistency. The capital offender who commits his crime in concert with others has a better chance for a life sentence, based on the leniency afforded his accomplices, than does the offender who acts alone." Id. at 1195.
Appellant's sentence of death should be affirmed.
NOTES
[1] This privilege has been codified at section 90.502, Florida Statutes (1983).
[2] We urge the trial courts of this state to refrain from allowing a jury to begin deliberations at 9:00 p.m., particularly in capital proceedings.
[3] Committed while appellant was on parole from a sentence of imprisonment in the Ohio State Penitentiary. § 921.141(5)(a), Fla. Stat.
2) Previous convictions of three violent felonies in Ohio; two separate armed robberies and shooting with intent to kill a police officer. § 921.141(5)(b).
3) Committed for pecuniary gain; hired to commit murder for $5,000. § 921.141(5)(f).
4) Committed to disrupt or hinder the lawful exercise of governmental functions or enforcement of laws; hired to commit murder to prevent the victim from testifying as a state witness in a criminal case. § 921.141(5)(g).
5) Committed in cold, calculated and premeditated manner without any pretense of moral or legal justification. § 921.141(5)(i).
We note in passing that the first aggravating circumstance was not proven beyond a reasonable doubt. Appellant's parole officer from Ohio testified that appellant was under his supervision when released from the Ohio State Penitentiary in 1979. The state simply failed to ask this witness whether appellant was still on parole on the date of this murder.