549 So.2d 652 (1989)
Hector FUENTE, Appellant,
v.
STATE of Florida, Appellee.
No. 69196.
Supreme Court of Florida.
September 14, 1989.
*653 Simson Unterberger, Tampa, for appellant.
Robert A. Butterworth, Atty. Gen., and William I. Munsey, Jr., Asst. Atty. Gen., Tampa, for appellee.
EHRLICH, Chief Justice.
Hector Fuente appeals his conviction of first-degree murder and sentence of death. We have jurisdiction pursuant to article. V, section 3(b)(1), of the Florida Constitution. We affirm the conviction but vacate the sentence of death.
According to the testimony of Fuente's half-brother, Ralph Salerno, Fuente entered into an agreement with his cousin, Barbara Alfonso, to kill her husband, Enrique, for $2,500 to $5,000. Salerno also testified that the motive for the murder was that the victim talked too much and was flashy. Fuente's cousin denied offering him money to kill her husband and testified that Fuente wanted the victim "out the way" because he "talked too much."
Salerno testified that on the day of the murder, Fuente instructed him to dig a grave off Howard Avenue in Tampa. After digging the grave, Salerno returned to Fuente's home and Fuente gave him a .38 stub-nosed handgun and an ankle holster. Fuente instructed Salerno to go to a Tampa lounge and wait there until he and the victim picked him up. Fuente was to get the victim to come along by asking him to act as the "muscle" in a drug deal that Fuente pretended was to take place that night. When Fuente and the victim arrived at the lounge, Salerno got in the back seat on the passenger side of the car behind the victim. The three drove to Morris Bridge Road where Salerno aimed the .38 at the back of the victim's seat and pulled the trigger three times; each time the gun misfired. When questioned by Alfonso, Salerno told him that he was just testing his gun. Alfonso offered to get his .38 from the motel which he and his wife managed for Fuente. Fuente went to get his .357 magnum from his house. He then drove to a vacant lot saying that he needed to urinate. He took the.357 to the back of the car and then returned to the open door on the driver's side of the car, pointed the gun at Alfonso, and pulled the trigger twice. It sounded to Salerno as if the first shot hit metal. After the second shot was fired, Alfonso exclaimed "oh, my God" and *654 raised his arm. According to Salerno, Fuente got in the car and ordered him to grab the arm so that it would not touch him. The arm went limp when Salerno let go of it. They drove to the grave site, where Salerno dragged the body to the grave and, at Fuente's direction, removed all of Alfonso's personal belongings except for his motel key. Fuente left the grave site, instructing Salerno to bury the victim, and later returned in a different car. Salerno was instructed to incinerate the first car.
Barbara Alfonso testified that after the murder, Fuente bragged about how he had murdered her husband and that they had discussed the murder on almost a daily basis. Sally Resina, Fuente's ex-wife, testified that Fuente told her, in the presence of Salerno, that he had murdered Enrique.
The murder was committed in November of 1979 but was not discovered until 1983 when Salerno admitted to authorities that he had been involved in various criminal activities, including the murder of Enrique Alfonso. Prior to being charged for this offense, Fuente was charged with and pled guilty to racketeering under 18 United States Code section 1962(c).
A first trial resulted in a mistrial. After a second trial, Fuente was found guilty of first-degree murder. The trial court overrode the jury's recommendation of life, imposing the death penalty. The trial court found three aggravating factors: 1) Fuente was previously convicted of a violent felony; 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; and 3) the homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. One nonstatutory mitigating factor was found: six months after the commission of this murder, Fuente saved a woman from drowning.

GUILT PHASE
Fuente raises seven claims in connection with his conviction, only three of which merit discussion.[1] As his first claim, Fuente maintains that he was entitled to discharge because the state failed to bring him to trial within 180 days after his request for final disposition under the Interstate Agreement on Detainers, paragraph 941.45(3)(a), Florida Statutes (1985). Under the Interstate Agreement on Detainers, a prisoner in one participating jurisdiction may require the speedy disposition of charges pending against him in another participating jurisdiction, when those charges serve as the basis for the lodging of a detainer against him, by requesting final disposition of the charges as set forth in paragraphs (3)(a) and (b) of the Agreement.[2] When a prisoner makes a request for disposition of charges for which a detainer has been filed against him, paragraph (5)(a) requires "the appropriate authority in [the] sending state [to] offer to deliver temporary custody of [the] prisoner to the appropriate authority in the state where [the charges are] pending... ." Under *655 paragraph (3)(a) of the Agreement, a prisoner must be brought to trial on out-of-state charges for which a detainer has been filed against him within 180 days after he has "caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition" of the charges pending against him. Paragraph (5)(c) of the Agreement provides that an action shall be dismissed with prejudice, if the prisoner is not brought to trial within the prescribed period. Paragraph (6)(a) of the Agreement provides that the running of the time period set forth in subsection (3) "shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." The issue before us is whether the 180-day period was tolled due to Fuente's inability to stand trial, under paragraph (6)(a).
Between May 22, 1985 and June 17, 1985, the detainer for the first-degree murder which is the subject of this appeal was lodged against Fuente with authorities at the federal prison facility in Memphis, Tennessee, where Fuente was serving a fifteen-year sentence in connection with his conviction of racketeering under 18 United States Code section 1962(c). On July 2, 1985, Florida authorities received or were on notice of Fuente's request for final disposition. On July 25, 1985, a transfer order was issued, ordering Fuente's transfer from the Memphis facility to the Lompoc, California Penitentiary for medical treatment. On August 1, 1985, Fuente began his journey to Lompoc, arriving there nineteen days later on August 20. Upon arriving at Lompoc facility, Fuente was placed in the general prison population until September 12, when he was an inpatient at the infirmary where he was treated for and recovered from a condition which arose subsequent to his arrival at that facility. On October 1, 1985, Fuente began a seventeen-day trek back to Memphis, arriving there on October 18. On November 25, 1985, the federal officials informed the Florida authorities that Fuente would be released to their custody sometime after December 4, 1985. Fuente was released to Florida officials and arrived at the Hillsborough County, Florida Jail on December 12, 1985. On March 4, 1986, 246 days after his request for final disposition was received by Florida authorities, Fuente filed a motion for discharge claiming that his right to be brought to trial within 180 days pursuant to section 941.45(3) had been violated.
At the hearing on the motion for discharge, the state took the position that the 180-day period was tolled pursuant to paragraph 941.45(6)(a), because Fuente was "unable to stand trial" due to his physical condition. The trial court denied the motion, based on an apparent misconception that the 180-day period did not begin to run until Fuente was turned over to Florida authorities. The 180-day period is generally held to begin to run when the request for final disposition is received by the prosecuting authorities. See Annotation, Interstate Agreement on Detainers Act, 98 A.L.R.3d 160, § 15a (1980), and cases cited therein. After oral argument, we relinquished jurisdiction and remanded to the trial court for a determination as to when the request was received by Florida authorities, and for a determination as to whether the running of the 180-day period was tolled, under paragraph (6)(a), due to Fuente's inability to stand trial. On remand, the trial court found that the 180-day period began to run on July 2, 1985 when the authorities received or were on notice of the request and was tolled for 78 days from August 1, 1985, to October 18, 1985.
Fuente argues that there is no evidence that he was unable to stand trial due to his physical or mental condition and that his transfer to another federal institution does not constitute inability to stand trial under paragraph (6)(a). On remand, the trial court reasoned that under the circumstances "it doesn't matter whether he was physically incapacitated or not ... when they are shipping him under these conditions from Memphis to California and the hospital and back, he is unable to stand trial, whether he could have, in fact, sat over there and assisted counsel or not." *656 We agree that under these circumstances Fuente was unable to stand trial. It is generally accepted that a defendant may be unable to stand trial for reasons other than physical or mental disability. See State v. Minnick, 413 So.2d 168 (Fla. 2d DCA 1982) (prisoner in custody of one receiving state is unable to stand trial in another receiving state); State v. Ivey, 410 So.2d 636 (Fla. 2d DCA 1982) (during the time when defendant was required by federal authorities to return to another city pursuant to a writ of habeas corpus ad testificandum and during the time that federal marshals incorrectly transported the defendant back to the federal correctional institution where he had been imprisoned, defendant was unable to stand trial under paragraph (6)(a)); State ex rel. Taylor v. McFarland, 675 S.W.2d 868 (Mo. Ct. App. 1984) (defendant was "unable to stand trial" during time he was held in California under order requiring him held as witness in another prosecution). We are not confronted with simple inaction on the part of the federal officials. See State v. Mason, 90 N.J. Super. 464, 218 A.2d 158 (Super.Ct.App.Div. 1966) (sending state's failure to make formal tender of temporary custody of prisoner to receiving state does not toll the running of the 180-day period); see also Rockmore v. State, 21 Ariz. App. 388, 519 P.2d 877 (Ct.App. 1974) (absence of an offer of temporary custody did not prevent request for final disposition from triggering the running of 180-day period); Bursque v. Moore, 26 Conn. Supp. 469, 227 A.2d 255 (Super.Ct. 1966) (purpose of agreement will not be frustrated by the studied inaction of sending state); People v. Esposito, 37 Misc.2d 386, 201 N.Y.S.2d 83 (Co.Ct. 1960) (purpose of agreement requires that adverse consequences of sending state's failure to offer temporary custody of prisoner be visited upon the prosecution rather than the prisoner); Nelms v. State, 532 S.W.2d 923 (Tenn. 1976) (prisoner will not be made victim of "contributory inaction" of sending and receiving states). Fuente was transferred to the Lompoc facility for medical treatment, pursuant to a valid transfer order issued under 18 United States Code section 4082. We do not find the fact that it appears that Fuente received no medical treatment for a preexisting condition while at the Lompoc facility dispositive. There is no evidence that Fuente was transferred to delay his prosecution for this murder. Under these circumstances, while Fuente was being transferred to Lompoc for medical treatment, during the time he was housed there and during his return to the Memphis facility, he was unable to stand trial within the meaning of paragraph 941.45(6)(a). Accordingly, the motion for discharge was properly denied.
Fuente's next claim involves Barbara Jean Wright's refusal to testify as a defense witness. Prior to the second trial, defense counsel took the deposition of Wright, whom the state had listed as a potential state witness. Because Wright's deposition contradicted testimony to be given by Barbara Alfonso, defense counsel listed Wright as a defense witness and served her with a subpoena to appear as a witness at trial. Wright's attorney notified defense counsel that if called as a witness, she would refuse to testify based on her fifth amendment privilege against self-incrimination. Fuente filed a motion to determine whether Wright could assert her privilege against self-incrimination. At the hearing on the motion, Wright maintained that her testimony might incriminate her as an accessory after the fact and might, because of the conflicts between her testimony and that of Alfonso, result in her being charged with perjury. The assistant state attorney informed the court that there was a possibility that Wright might be charged with a criminal offense based on her testimony. The assistant state attorney also informed the court that the state was not willing to grant Wright immunity. The trial court determined that Wright was entitled to assert her fifth amendment privilege because "[i]t's the question of accessory after the fact that she is facing." It is unclear from the record whether Wright was allowed to assert the privilege based on the possibility that her testimony might result in a perjury charge.
Fuente argues that it was error to allow Wright to assert the right to avoid *657 being prosecuted for perjury. He also maintains that the trial court erred by not requiring that the state grant Wright use immunity or face the entry of a judgment of acquittal, a procedure approved by the Third District Court of Appeal in State v. Montgomery, 467 So.2d 387 (Fla. 3d DCA 1985).[3] We need not address these contentions because it is clear from the record that any error which may have occurred in connection with Wright's refusal to testify was harmless beyond a reasonable doubt, because there is no reasonable possibility that Wright's failure to testify affected the verdict. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). Wright's testimony would have been offered to attack Barbara Alfonso's credibility. Her deposition testimony contradicted Alfonso's testimony regarding what the trial court referred to as "immaterial matters [which would be] brought out on cross-examination." These collateral matters include whether Wright helped Barbara Alfonso clean the car after the murder and the reason given by Alfonso for going to Miami after the murder. During the hearing on the motion to determine whether Wright could assert her fifth amendment right, the trial court correctly pointed out to defense counsel that the testimony would be inadmissible because "you cannot impeach on an immaterial matter." See Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981) (a witness can not be impeached with regard to a matter brought out on cross-examination which is collateral and nonmaterial to any issue at trial by any of the normal means of impeachment, including contradictory testimony by another witness); see also C. Ehrhardt, Florida Evidence § 608.1 (2d ed. 1984). Not only would this contradictory testimony have been inadmissible, the verdict was in no way affected by the alleged erroneous ruling, because, during cross-examination, defense counsel, without objection, questioned Alfonso in connection with the contradictions contained in Wright's deposition.
Fuente next claims that he was entitled to a dismissal based on double jeopardy grounds. Fuente's first trial resulted in a mistrial as a result of a question and answer elicited by the prosecution during the redirect examination of Ralph Salerno. During direct examination, Salerno testified that he had been involved in criminal activity and that the victim had been involved in similar criminal activity. On redirect examination, the prosecutor asked Salerno about what led him to become involved in criminal activity, to which he responded "Hector Fuente." A motion for mistrial was granted. Prior to the second trial Fuente filed a motion to dismiss, arguing that retrial was barred by the double jeopardy clause. The motion was denied without findings.
The double jeopardy clause of the fifth amendment of the United States Constitution bars repeated prosecutions for the same offense. Where a mistrial is granted over defense objection, a second trial is barred unless a "manifest necessity" for the mistrial is established. Oregon v. Kennedy, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982). Double jeopardy is generally no bar to a subsequent prosecution when a mistrial was granted in the original trial upon the defendant's motion. *658 Id. at 673, 102 S.Ct. at 2088; Bell v. State, 413 So.2d 1292, 1294 (Fla. 5th DCA 1982). In Oregon v. Kennedy, the United States Supreme Court held that there is a narrow exception to this rule where it can be shown that the prosecution's "conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." 456 U.S. at 679, 102 S.Ct. at 2091. In rejecting the "overreaching" standard for determining when retrial is barred that was adopted by the Oregon Court of Appeals, the Court explained that prosecutorial conduct that might be viewed as harassment or overreaching sufficient to justify a mistrial, is insufficient to bar a retrial absent such an intent. Id. at 675-76, 102 S.Ct. at 2089-90. "Only where the governmental conduct in question is intended to `goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Id. at 676, 102 S.Ct. at 2089.
The appellant bases his double jeopardy claim on alleged "overreaching" by the prosecution which "invited the accused's request for mistrial ... for the purpose of affording the prosecution a more favorable opportunity or advantage for conviction." Even if such overreaching were sufficient to bar retrial in this case, this "overreaching" or "invited mistrial" argument was not presented to the trial court. In fact, trial counsel took the position that the question which resulted in mistrial was "grossly negligent" rather than "deliberately asked for that very purpose." Because intent was never placed in issue in this case, no finding of prosecutorial intent was made.[4] Therefore, we affirm the denial of Fuente's motion to dismiss the second trial.

PENALTY PHASE
Fuente challenges the trial court's override of the jury's recommendation of life imprisonment. Because we find that even if all three aggravating factors were properly found the jury override was improper in this case, we need not address Fuente's challenge to two of these factors.[5] It is clear from the record that during the penalty phase closing argument defense counsel relied heavily on the fact that both Salerno and Barbara Alfonso had received total immunity from prosecution in exchange for their testimony. Although it was not clear that Salerno had been given immunity from state prosecution, Barbara Alfonso testified that she had been promised immunity by state authorities. Fuente argues that the jury could have reasonably based its recommendation on the apparent disparate treatment accorded Salerno and the victim's wife.
In McCampbell v. State, 421 So.2d 1072 (Fla. 1982), we recognized that a jury may reasonably base its recommendation of life on disparate treatment accorded a co-perpetrator. See also Pentecost v. State, 545 So.2d 861 (Fla. 1989); Spivey v. State, 529 So.2d 1088 (Fla. 1988); Harmon v. State, 527 So.2d 182 (Fla. 1988). More recently, in Brookings v. State, 495 So.2d 135, 143 (Fla. 1986), on facts quite similar to those presented in this case, we held that the disparate treatment accorded "principals in [a] contract murder, helping to plan and carry out [the] crime" could serve as a reasonable basis for a recommendation of life. In Brookings, the woman who hired Brookings to kill the victim was allowed to plead to second-degree murder and the active participant in the killing received total immunity. In Brookings, there were four valid aggravating circumstances: 1) convictions of three violent felonies; 2) the murder was committed for pecuniary gain; 3) the murder was committed to prevent the victim from testifying as a state witness; *659 and 4) the murder was committed in a cold, calculated, and premeditated manner. Id. at 142 n. 3. The trial court in Brookings found three nonstatutory mitigating factors, two of which specifically dealt with the differing treatment accorded the co-participants. Id. at 142. Although Brookings had pulled the trigger, we concluded that the fact that one participant would escape the death penalty and the other would walk away totally free while the ultimate penalty was sought against Brookings were facts that could reasonably be considered by the jury. Therefore, under the Tedder[6] standard, the override was improper. Id. at 142-43. Brookings cannot be distinguished from this case by the fact that the trial court in Brookings found the disparate treatment of the co-perpetrators a mitigating factor and the trial judge in this case did not. See Caillier v. State, 523 So.2d 158 (Fla. 1988) (disparate treatment accorded equally culpable accomplice could have served as basis for jury's recommendation of life despite fact that trial judge specifically rejected such treatment as a mitigating factor). Because the jury in this case could have reasonably based its recommendation on the fact that Salerno and the victim's wife would likely not be prosecuted for their participation in the murder, the override was improper.
Accordingly, we affirm the conviction of first-degree murder, vacate the sentence of death, and remand this cause to the trial court for the imposition of a sentence of life imprisonment without eligibility for parole for twenty-five years.
It is so ordered.
OVERTON, McDONALD, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] The four claims which do not merit discussion are: 1) that he was entitled to discharge due to the state's use of perjured testimony; 2) that the instruction on principals/aiders and abettors was unsupported by the evidence; 3) that state's witness Cabrera was improperly rehabilitated by prior consistent statement; 4) that an unqualified witness was allowed to testify concerning the meaning of the X on the victim's dental X-rays.
[2] Section 941.45(3)(a), Florida Statutes (1985), provides in pertinent part:

(3) REQUEST FOR FINAL DISPOSITION. 
(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint... .
Section 941.45(3)(b) provides in pertinent part:
The written notice and request for final disposition... shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court... .
[3] In Montgomery, the defendant sought testimony of a witness who refused to testify unless he was granted immunity. After noting that the sixth amendment and the due process clause of the United States Constitution and article I, sections 9 and 16, of the Florida Constitution, guarantee a defendant the right to subpoena a witness, and to have that witness available as he finds him, the court held that when that right is infringed upon by some form of prosecutorial misconduct, a judgment of aquittal is warranted. State v. Montgomery, 467 So.2d 387, 392 (Fla. 3d DCA 1985). The court went on to conclude that where a defendant can make a substantial showing that the state's refusal to grant immunity to a defense witness who asserts his fifth amendment privilege was made with the deliberate intention of distorting the judicial factfinding process,

the court has remedial power to require that the distortion be redressed by requiring a grant of use immunity to the witness as an alternative to a judgment of acquittal.
Id. (footnote omitted). Fuente urges us to adopt the Third District Court's approach and hold that, where an intent to distort the judicial factfinding process is established, a judgment of acquittal must be granted, unless the state redresses the distortion by granting use immunity.
[4] See United States v. Posner, 764 F.2d 1535 (11th Cir.1985) (where no finding of prosecutorial intent was made by trial court, appellate court rejected claim that retrial was barred).
[5] Fuente maintains that his conviction for violating 18 United States Code section 1962(c) does not constitute a conviction of a prior violent felony, under paragraph 921.141(5)(b), Florida Statutes (1979), and that the aggravating circumstance of avoiding arrest, under paragraph 921.141(5)(e), Florida Statutes (1979), was not supported by the evidence.
[6] Tedder v. State, 322 So.2d 908 (Fla. 1975).