382 So.2d 1190 (1979)
Rodney Wayne MALLOY, Appellant,
v.
STATE of Florida, Appellee.
No. 49580.
Supreme Court of Florida.
December 20, 1979.
*1191 Jack O. Johnson, Public Defender, and Paul J. Martin, Thomas A. Pobjecky and James R. Wulchak, Asst. Public Defenders, Bartow, for appellant.
Jim Smith, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
This is a direct appeal from the imposition of a death sentence. Appellant was convicted of two counts of murder in the first degree, two counts of kidnapping, and one count of robbery. The trial judge, after receiving a jury recommendation for life sentences for the murder convictions, imposed a sentence of death for each of the murders and consecutive life sentences for the other crimes. We have jurisdiction.[1] For the reasons expressed, we affirm the convictions and reduce the sentence to life imprisonment in accordance with the recommendation of the jury.
The record in this case reveals that on the night of November 8, 1975, the appellant was in attendance at a party at the Surrett residence where appellant rented a room which he shared with the Surretts' minor children. Also present at the party were Ricky Robinson and Ricky Houston, both of whom were charged along with the appellant for the murder in the first degree of Leo Eggering and Ronald Cole. The appellant and his codefendants consumed a combination of alcohol and drugs that evening, appellant acknowledging that he had ingested "windowpane acid" (LSD), Psilocybin (mushroom tea), and alcohol.
Houston and Robinson, after negotiating pleas, testified for the prosecution. They related that they and the appellant, accompanied by a friend, left the Surrett party about midnight and drove to a lounge in Lakeland. When they arrived at the parking lot of the lounge, the group noticed that two persons were arguing and the appellant assertedly told them to "shut up." When they did not, the appellant allegedly got out of the car and began to pull out a rifle which was on the front seat. Subsequent to this incident, they dropped off their friend and proceeded to a restaurant to eat breakfast. While there, the three formulated a plan to steal some stereo equipment from the victims, Leo Eggering and Ronald Cole.
The appellant and his companions went to the apartment of the victims, arriving there at approximately 2:30 a.m. They gained entrance through a subterfuge, and Houston at rifle point forced the victims to stand in the bathtub. The three men took turns holding the rifle, which belonged to Houston, on the victims while the others carried various items out to the car. After the group had taken what they wanted, the appellant placed heavy tape over the eyes and mouths of the victims and then covered their heads with pillowcases. The two victims were led to the car and put in the back seat. With Houston driving, the trio transported their victims to the Piper aircraft plant. Houston and Robinson testified that they tried for twenty minutes to dissuade the appellant from murdering the victims. They testified that the appellant stated that one of the victims knew him and had to be killed and said: "Dead men tell no tales." According to the testimony of Houston and Robinson, the appellant led the victims away from the car and shot each victim one time in the head. At approximately 5:30 a.m. the appellant, accompanied by Robinson and Houston, returned to the Surrett residence and carried the victims' stereo equipment into his room.
Appellant testified in his own behalf. His version of the events differed from that of his accomplices in that he claimed that he did not shoot the victims. According to the appellant, Robinson led the victims away from the car and while he and Houston were discussing the stolen goods two shots were heard. The appellant stated that Robinson then reappeared and admitted shooting the victims.
Approximately two weeks after the incident a deputy sheriff was advised that merchandise *1192 from a burglary of a market was in the Surrett residence. Deputies went to the residence, knocked on the door, and were admitted into the living room. In plain view they saw many cartons of cigarettes and large quantities of beer. Large amounts of cigarettes and beer had been reported stolen from the market. They arrested the appellant, Houston, and Robinson, and charged each with the burglary of the market. After calling for additional officers, they asked Mrs. Surrett for permission to search the house, and she signed a consent form. In the search which followed, they found the stereo and other articles which belonged to the victims Eggering and Cole in a bedroom shared jointly by appellant and Mrs. Surrett's minor sons.
Prior to trial Houston and Robinson negotiated with the State and were allowed to plead nolo contendere to two counts of the lesser charge of accessory after the fact to first degree murder, two kidnapping charges, robbery, burglary, and grand larceny. They received five- to ten-year concurrent sentences on all offenses except the burglary and larceny offenses for which they received five-year concurrent sentences.

Part I
The appellant asserts that his convictions should be reversed because (1) it was error for the trial court to deny appellant's motion to suppress the stereo equipment and other articles belonging to the victims which were seized during a search of his shared bedroom in the Surrett house; (2) it was error to allow the State to call the father of one of the victims as an identification witness; (3) it was error to allow testimony regarding the incident involving the rifle at the lounge; and (4) it was error for the trial court to instruct the jury on the penalty for second degree murder.
In answer to the appellant's assertion that the search was illegal and evidence discovered during the search should have been excluded, it is our view that the motion to suppress was properly denied. The police had obtained the consent of the owner of the home before making their search. The consent was found by the trial judge to be voluntary and proper under the circumstances of this case, and we agree.
The appellant, in his second contention, claims that the admission of the identification testimony by the father of one of the victims was error. We have previously held, however, that even the admission of testimony from a member of the victim's family is not fundamental error. Rankin v. State, 143 So.2d 193, 196-97 (Fla. 1962). The testimony of the father was admitted without objection, so that on this record the admissibility of the testimony is not a proper issue for our consideration. State v. Barber, 301 So.2d 7, 9 (Fla. 1974); State v. Jones, 204 So.2d 515, 519 (Fla. 1967).
Appellant's third contention is without merit. In our view, the testimony regarding the incident at the lounge was properly admitted. It was one incident in a chain of chronological events which began with the termination of the party at the Surrett residence at approximately 12:30 a.m. and concluded with the delivery of the victims' property to the appellant's bedroom at 5:30 a.m. back at the Surrett premises. In addition, the circumstances of the lounge incident do not establish all the elements of a crime and, consequently, the question of the admissibility of prior criminal acts is not present.
Finally, the trial court's inclusion in its instructions of the penalty for second degree murder was proper. See Dorminey v. State, 314 So.2d 134 (Fla. 1975); Fla.R. Crim.P. 3.390(a). We find no error in the instructions.
We conclude that the convictions of the appellant of two counts of murder in the first degree, two counts of kidnapping, and one count of robbery are fully supported by the evidence, and we affirm.

Part II
The sentence review function of this Court in the instant case is particularly difficult. The jury recommended that the *1193 appellant receive life sentences. The trial judge overruled the jury's recommendation and imposed two sentences of death.
Much of the testimony in this case is without conflict, and it established without question that each of the three participating individuals was guilty of two execution-type murders, which ordinarily should result in the imposition of the death penalty. We find, however, that the recommendation of life imprisonment made by the jury has a reasonable basis under the circumstances of this cause.
We have repeatedly stated that in reviewing the propriety of a death sentence, this Court must weigh heavily the advisory opinion of life imprisonment by the sentencing jury. The facts justifying the death sentence must be clear and convincing in order to overrule the jury's recommendation. McCaskill v. State, 344 So.2d 1276, 1280 (Fla. 1977); Dobbert v. State, 328 So.2d 433 (Fla. 1976), aff'd, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). Therefore, we must examine this record to determine whether there are clear and convincing facts that warranted the imposition of the death penalty, and, in doing so, we must determine if there was a reasonable basis for the jury's recommendation.
We find that the jury's action was reasonable because of the conflict in the testimony as to who was actually the triggerman and because of the plea bargains between the accomplices and the State.
From the evidence presented, the jury could have believed the appellant's story that he was not the triggerman and still have convicted him of first degree murder. § 777.011, Fla. Stat. (1977). The jury also could have based its life sentence recommendation on the fact that Robinson, who appellant claimed fired the shots, and Houston, who owned the gun, were each allowed to plead guilty to a lesser charge and receive only a five- to ten-year sentence. All three participants were parties to this execution slaying. The issue of the identity of the triggerman may not have been totally controlling. Under the circumstances of this case it was reasonable to conclude that all participants were equally culpable since there was no reason to bind, gag, and blindfold the victims and take them miles away to an unrelated building unless there was an agreement between the three to murder the victims. It is also reasonable to conclude that the jury may have reached its recommendation because of the relatively equal complicity of the other participants and the plea bargains made with them by the state.
Because of the jury's recommendation of a life sentence and the fact that there is a reasonable basis for its recommendation, we must agree that to impose the death sentence on the appellant would not be consistent with other sentences imposed in similar circumstances in accordance with the principles laid down by the United States Supreme Court in Proffitt v. Florida, 428 U.S. 242, 258-60, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Our ruling does not mean that the imposition of the death sentence is always dependent upon the sentences of accomplices. It is a factor, however, that may be considered along with evidence of complicity. Each case will depend on its own facts and circumstances. See Witt v. State, 342 So.2d 497 (Fla. 1977).
For the foregoing reasons, we affirm the appellant's convictions but reverse the sentences of death and remand with directions to enter an order sentencing the appellant to two life imprisonments, each without the possibility of parole for twenty-five years.
It is so ordered.
ENGLAND, C.J., and OVERTON, SUNDBERG and ALDERMAN, JJ., concur.
BOYD, J., concurring in part and dissenting in part with an opinion, with which ADKINS, J., concurs.
BOYD, Justice, concurring in part and dissenting in part.
I concur in the affirmance of the convictions but dissent from the reduction of sentence.
*1194 The appellant was convicted of two counts of murder in the first degree. The jury recommended life imprisonment. The majority orders the death sentence imposed by the trial court reduced to life on the ground that the lenient treatment of actually shot the victims were reasonable bases for the life imprisonment recommendation. I disagree.
The two victims were held at rifle point, their eyes and mouths taped and their heads covered, as they were transported to the place of their execution. The murders were committed in the course of a robbery. The victims were killed to assure that they would be unavailable as witnesses against the appellant and his accomplices. The majority recognizes that under our past death sentence decisions, the extreme penalty is appropriate to the circumstances of this appellant's crime. It is because of the lenient treatment of the accomplices and appellant's uncorroborated statement at trial that death is held to be inappropriate. Without saying whether either of these factors standing alone would be sufficient, the Court holds that taken together they constitute a reasonable basis for the jury recommendation.

I.
In Slater v. State, 316 So.2d 539 (Fla. 1975), the Court had for review a sentence of death imposed following a jury recommendation of life. We concluded that the jury recommendation was presumably based on the fact that the appellant's co-participant, who was the actual "triggerman," had pled nolo to a charge of first-degree murder and received a life sentence. Our decision was based on the fact that it was reasonable for the jury to conclude that Slater was less culpable than the other offender, whose life state authorities had arranged to spare.
In Messer v. State, 330 So.2d 137 (Fla. 1975), the jury recommended death but we vacated the sentence, partly on the ground that the appellant was entitled to have the jury informed that an equally culpable accomplice had negotiated a plea of guilty to second-degree murder and received a thirty-year sentence.
In Witt v. State, 342 So.2d 497 (Fla. 1977), we affirmed the death sentence imposed following a jury recommendation of death. We found it necessary to explain, however, why death was the appropriate penalty in view of the fact that an accomplice had pled guilty on condition of receiving life imprisonment. Such "discretionary inconsistency," we said, cannot be ignored. Id. at 500. We then specifically held that the facts of the case supported death for the appellant and life for the accomplice, who had acted under the appellant's domination.
In Barclay v. State, 343 So.2d 1266 (Fla. 1977), two jointly tried capital offenders were sentenced to death after the jury recommended life for one and death for the other. This Court, in upholding the death sentences, relied on the principle that equally culpable co-perpetrators should not receive disparate treatment. I dissent from affirming the death sentence of one of the appellants, imposed contrary to the jury recommendation, because my view of the evidence was that one of the offenders was more culpable than the other.
In Smith v. State, 365 So.2d 704 (Fla. 1978), the appellant's accomplice pled nolo, testified at the appellant's trial, and was subsequently sentenced to life imprisonment. The appellant argued that his death sentence, which the jury recommended, was improper. This Court upheld the death sentence. Slater v. State was distinguishable, we said, because there the co-perpetrator who received life was the actual wielder of the murder weapon. Smith's culpability, on the other hand, was much greater than that of his accomplice in that Smith was the dominant force in the commission of the murder. Thus disparity of treatment was held to be justified.
In Salvatore v. State, 366 So.2d 745 (Fla. 1978), the appellant argued that under the Slater rule the sentence imposed on him was improper because his accomplice received a ten-year sentence on a guilty plea to second-degree murder. The majority of *1195 this Court distinguished Slater, concluding from the evidence that the appellant was more culpable than his accomplice.
Finally, in Jackson v. State, 366 So.2d 752 (Fla. 1978), we were once again faced with the contention, based on Slater, that a death sentence was improper because of the life sentence given to his accomplice pursuant to a guilty plea. The Court pointed out that the appellant had been the dominating factor and that with regard to the accomplice this served as a mitigating circumstance under section 921.141(6)(e), Florida Statutes (1975). Therefore, the disparity was justified.

II.
This Court's review function under the capital felony sentencing law is designed to assure consistency in the imposition of the extreme penalty. The Court performs this function by comparing the facts and circumstances of each case with those of other cases in which the death penalty is imposed. This function is crucial to the law's constitutionality. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976);[1]State v. Dixon, 283 So.2d 1 (Fla. 1973). It should not be our function to compare the sentence imposed on a convicted capital offender with the treatment of his co-perpetrators or accomplices. This latter kind of comparison, emanating from the Slater case, should not be considered a proper consideration for the jury or for this Court, because it contributes not to consistency but to inconsistency. The capital offender who commits his crime in concert with others has a better chance for a life sentence, based on the leniency afforded his accomplices, than does the offender who acts alone.
In the present case, the appellant's accomplices testified against him at trial. The appellant's crimes would have been difficult to prove without the cooperation of the other participants, or so must the prosecutors have determined. The fact that the prosecutors arranged for them a very good deal has nothing to do with the propriety of the death sentence, which must be determined in light of previous death penalty decisions of this Court.
In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the petitioner contended that the existence of prosecutorial and jury discretion rendered the new Georgia death penalty scheme violative of the principles of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because they allow for arbitrariness and inconsistency. The Court responded that the existence of prosecutorial discretion does not violate Furman.[2]
*1196 Prosecutorial discretion to plea bargain is an accepted feature of our criminal justice system. We cannot review every prosecutorial decision of this kind, not even in death penalty cases. Even when the prosecutor does not need the testimony of a co-participant, there is discretion to accept a plea of guilty to a lesser offense or in exchange for an agreement for a certain sentence. Sometimes two offenders are equally culpable but one is punished more lightly than the other on no other basis than his willingness to plead guilty and permit a saving of limited prosecutorial resources. We must assume that in general our prosecuting authorities will seek the more severe penalties for the more culpable offenders, and that they will plea bargain, for testimony or otherwise, with participants who appear to be less culpable.

III.
In the present case the prosecutor apparently bargained for the accomplices' testimony. The need of the prosecutor to do so justified the disparate treatment. The leniency of the treatment of the accomplices, or the fact that the prosecutor may have made a bad bargain on behalf of the state, does not call into question the propriety of the death sentence in the circumstances of this case. This leniency is part of the basis the majority perceives as justifying the jury recommendation. It is not a reasonable basis and thus is no ground to hold that the court erred, in light of the aggravating circumstances and lack of mitigating circumstances, in overruling the recommendation. Tedder v. State, 322 So.2d 908 (Fla. 1975). Where the less severely punished co-perpetrator is more culpable, or where the capital appellant is substantially dominated by another, the law is different.
The majority bases its decision in part on the fact that the jury could have believed that the appellant did not actually fire the fatal shots. Such fact, supported by a conflict between the trial testimony of appellant and that of one of his co-participants, is held to be a reasonable basis for the jury recommendation.
In Slater v. State, 316 So.2d 539 (Fla. 1975), discussed above, the life sentence of the trigger man was among the "circumstances surrounding this offense" justifying the jury recommendation of life imprisonment. Id. at 542. There, the record clearly reflected that the appellant "was an accomplice and did not have the murder weapon in his hand." Id. at 542. The crime was committed in the course of a motel robbery and there was testimony by a police officer that the trigger man's confession described the shooting itself as accidental.
In the present case, all three men were equal participants in the robbery, kidnapping and murder. The majority recognizes *1197 that all three were principals in the commission of the capital felonies. They entered their victims' home, robbed them, took them away at gunpoint, and intentionally murdered them.
Bound by the decisions of this Court upholding sentences of death where the circumstances of the crime and the character of the offender were similar to what we are faced with in this case, I would affirm the sentence of death.
ADKINS, J., concurs.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[1] "Under Florida's capital-sentencing procedures, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. Moreover, their decisions are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances." Proffitt v. Florida, 428 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) (plurality opinion). "The Supreme Court of Florida reviews each death sentence to ensure that similar results are reached in similar cases." Id. at 258, 96 S.Ct. at 2969 (Plurality opinion) (footnote omitted).
[2] The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (plurality opinion) (footnote omitted).
Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly "similar." If the cases really were "similar" in relevant respects, it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary.
Petitioner's argument that there is an unconstitutional amount of discretion in the system which separates those suspects who receive the death penalty from those who receive life imprisonment a lesser penalty or are acquitted or never charged seems to be in final analysis an indictment of our entire system of justice. Petitioner has argued in effect that no matter how effective the death penalty may be as a punishment, government, created and run as it must be by humans, is inevitably incompetent to administer it. This cannot be accepted as a proposition of constitutional law.
Id. at 225-26, 96 S.Ct. at 2949. (Opinion of White, J., joined by Burger, C.J., and Rehnquist, J.)