527 So.2d 182 (1988)
James Ansel HARMON, Appellant,
v.
STATE of Florida, Appellee.
No. 69824.
Supreme Court of Florida.
May 19, 1988.
Rehearing Denied July 18, 1988.
*184 James B. Gibson, Public Defender and Christopher S. Quarles, Chief, Capital Appeals, Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Kevin Kitpatrick Carson, Asst. Atty. Gen., Daytona Beach, for appellee.
EHRLICH, Justice.
James Ansel Harmon appeals his conviction of first-degree murder and death sentence imposed. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The evidence at trial established the following scenario. The victim, Charles Germany, was found on the kitchen floor by police on October 16, 1985. The victim's son estimated that his father had between $2,500 and $5,000 in cash at the house before his death. The son was convinced that Larry Bennett and Harmon had murdered his father and informed the police at the scene that they should apprehend these two individuals. Based on these initial accusations as well as accusations from other members of the victim's family, Investigator Combs concentrated on Bennett and Harmon as suspects.
Harmon was informed by a friend that the police were looking for him and Bennett. Harmon, who was then in Texas, contacted Investigator Combs and agreed to meet him in Florida for an interview as soon as he arrived from Texas. Arriving in Florida on October 23, 1985, Harmon told Combs of his business arrangement with Marion Germany, the victim's brother, which involved purchasing, repairing, and then selling used appliances. In connection with this business, Harmon stated that he and Bennett left Texas and drove to a house owned by Marion Germany in the Ocala area. They arrived in September 1985 and stayed for a couple of weeks. Near the beginning of October, Bennett, Harmon and Marion Germany traveled to Columbia, South Carolina where other members of the Germany family resided. The victim, Charles, remained at the Florida home while the others traveled to South Carolina. Harmon then gave a recorded statement accounting for his whereabouts the weeks before and the days after the murder. Harmon informed Combs that he and Bennett had separated in Texas after Bennett declined to return to Florida with him to try to clear up the situation. Combs did not arrest Harmon at this time and Harmon drove back to South Carolina.
Three days later, on October 26, 1985, Bennett approached the police in Glendale, Arizona and gave a statement concerning his version of the events during the period of time in question. In this statement, Bennett recounted that while they were in Columbia, Harmon announced late one night that they were going to take a trip. Bennett claimed that although he did not know where they were going or what Harmon planned to do, it was not unusual for the pair to leave on a trip in the middle of the night. The pair arrived at Marion Germany's home in Florida at daybreak. Charles was home when Bennett and Harmon arrived. Bennett identified himself so Charles would not think he was a prowler and then entered the home. Harmon came in later, having remained in the car asleep for a short time. When Harmon entered, he went into the bathroom.
Bennett stated that he leaned against the table with his head down for a moment and that when he looked up, Harmon was behind Charles Germany pointing a gun at his head and then he fired the fatal shot. Harmon then took the victim's wallet. After cleaning up and attempting to remove any fingerprints, the pair drove back to Columbia. Along the way, Harmon dismantled the murder weapon and disposed of it. He *185 also cut up and disposed of the victim's wallet and identification. Harmon counted out $2,251.00, giving Bennett approximately $250.00 at that time and additional money over the next few weeks. After returning to Columbia, Bennett and Harmon switched vehicles and then left for Arizona.
Based on Bennett's statement, Harmon was arrested. Bennett pled guilty to second-degree murder in return for a seventeen year sentence cap. After Harmon's trial, the trial court placed Bennett on probation for a period of fifteen years.
At trial, Bennett testified against Harmon. Mark Shadle, an inmate who shared a cell with Harmon in November, 1985, also testified, stating that Harmon told him that he and Bennett robbed Charles Germany and that in the process Harmon shot the victim in the back. Harmon was found guilty of first-degree murder while engaged in the perpetration of a robbery. The jury recommended that the trial court impose a sentence of life imprisonment upon Harmon without possibility of parole for twenty-five years. The trial court overrode the jury's recommendation and imposed a sentence of death. The trial court found four aggravating circumstances: (1) Harmon was previously convicted of a felony involving the use or threat of violence to another person;[1] (2) the capital felony was committed for pecuniary gain;[2] (3) the capital felony was cold, calculated and premeditated;[3] and (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest.[4] The trial court found no mitigating circumstances, statutory or nonstatutory.

Guilt Phase
Harmon raises four issues concerning the guilt phase of the trial of which only two, alleged impermissible introduction of evidence of collateral crimes and judicial comment on the credibility of a witness, merit discussion.[5]
Harmon first alleges that the state was improperly permitted to introduce evidence of numerous collateral crimes and bad acts in violation of Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959) and section 90.404(2), Florida Statutes (1985). "The Williams rule is calculated to prevent the unfairness of convicting the accused on the basis of evidence showing him to have bad character or a propensity to commit crimes such as the one charged." Waterhouse v. State, 429 So.2d 301, 306 (Fla.), cert. denied, 464 U.S. 977, 104 S.Ct. 415, 78 L.Ed.2d 352 (1983). Harmon contends he was prejudiced by this alleged improper testimony and is entitled to a new trial. We disagree.
The first evidence objected to is a statement by Kathy Gates, during re-direct examination by the prosecutor, that Harmon previously had a drug habit, but had since "kicked it." Harmon's argument that this testimony was improper evidence of collateral crimes or bad acts has not been properly preserved for appeal. In order for an argument to be cognizable on appeal, it must be the specific contention asserted as the legal ground for the objection below and the only objection raised to this testimony was that it was beyond the scope of cross-examination. See Steinhorst v. State, 412 So.2d 332, 338 (Fla. 1982). We also reject Harmon's contention that the trial court erred in overruling defense counsel's objection that this testimony was beyond the scope of cross examination. "A party may re-examine a witness about any matter brought up on cross-examination, and a trial court has broad discretion in determining the proper scope of the examination of witnesses." Johnston v. State, 497 So.2d 863, 869 (Fla. 1986) (citations omitted). The record indicates that the re-direct examination of Kathy Gates was *186 within the scope of questions asked on cross-examination and the trial court did not abuse its discretion in so finding. Furthermore, any error in permitting this evidence is harmless in light of the fact that Bennett testified, without objection, that Harmon had introduced him to the use of drugs. See Johnston, 497 So.2d at 868.
Harmon next claims that the trial court, over objection, erroneously allowed the state to introduce evidence that he was involved with stolen jewelry. This evidence was admitted through the testimony of Shadle, Harmon's cellmate. Shadle testified that Harmon asked him to go to South Carolina after he was released, pick up some diamonds and sell them, and that Harmon would split the proceeds with him. This statement was relevant to demonstrate the trust relationship that had developed between Harmon and Shadle and to provide the context in which Harmon's admission of the murder was made to Shadle and was therefore admissible. See Waterhouse, 429 So.2d at 306.
The third statement objected to was testimony by Bennett that he, Harmon and Marion Germany planned to commit insurance fraud. We do not believe that this testimony was relevant to a material fact in issue. We have previously held, however, that the "admission of irrelevant evidence tending to show commission of a dissimilar or much less serious crime ... may be harmless error." Id. We are not persuaded that any prejudice flowed from the evidence concerning insurance fraud when there was ample evidence of Harmon's guilt. We therefore find the error to have been harmless. See Craig v. State, 510 So.2d 857, 864 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988).
We also reject Harmon's contention that he was prejudiced by the testimony of Powell that he met Harmon while in jail. The trial court, upon defense counsel's objection, correctly gave a curative instruction and defense counsel did not ask for a mistrial. Any prejudice which may have resulted from the jury inferring from this reference that Harmon had previously been incarcerated was alleviated by the curative instruction. See Johnston, 497 So.2d at 869. In addition, the jury was aware, through testimony of Harmon, that Harmon had been convicted of six prior felonies. Accordingly, any error that may have resulted from the admission of this statement would have been harmless. Id. at 868.
Any error in permitting the state to ask Harmon why he did not talk to authorities in Texas when he found out they were looking for him would also be harmless. Harmon had previously testified, during direct examination by his defense counsel, that he knew Texas authorities wanted to question him about something that had occurred in Alabama. Id.
No objection was made at trial to the remainder of the evidence that Harmon challenges as improper evidence of collateral crimes. Harmon's complaints regarding this evidence have therefore not been preserved for appeal. Phillips v. State, 476 So.2d 194, 196 (Fla. 1985).
We also reject Harmon's argument that the trial judge committed fundamental error by commenting on the credibility of Larry Bennett on four occasions, resulting in a denial of Harmon's constitutional rights to due process and to a fair trial. After the state concluded direct examination of Bennett, defense counsel sought to impeach Bennett with prior statements alleged to be inconsistent. On two occasions, when the prosecutor objected on the ground that the statements were not inconsistent, the trial judge replied that the statements seemed consistent to him also, but that it was for the jury to decide. The third alleged improper comment occurred when, during redirect examination, Bennett testified that he had returned to a Christian life-style. When defense counsel objected to this testimony based on relevancy, the trial court stated that it "may have something to do with his credibility," but did not permit any additional testimony on the subject.
Section 90.106, Florida Statutes (1985), provides that a judge may not comment to *187 the jury on the weight of the evidence or the credibility of the witnesses. Harmon's defense counsel, however, did not object to the comments described above. In the absence of a contemporaneous objection, a conviction will not be reversed because an improper comment is made unless the comment is so prejudicial as to amount to fundamental error. See Ross v. State, 386 So.2d 1191, 1195 (Fla. 1980). Furthermore, viewed in the context in which they were made, the comments do not constitute "fundamental error." The comments were incidental within the scheme of the overall record and, in addition, were couched in qualifying terms. See Lusk v. State, 446 So.2d 1038 (Fla.), cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984). Harmon has not demonstrated that these comments were harmful error.
The fourth alleged improper comment occurred during cross-examination of Bennett. Although defense counsel approached the bench and complained to the trial court about the comment, the record reflects that this comment was made by the testifying witness, not the trial judge. The burden of taking steps to ensure that such an error in the record is corrected is on the appellant. See Gulf Heating and Refrigeration Co. v. Iowa Mut. Ins. Co., 193 So.2d 4 (Fla. 1966). Harmon has not established that the transcript in the present case was erroneous. Accordingly, no error which would necessitate reversal has been demonstrated.
We have thoroughly examined the entire record and find the evidence more than sufficient to support Harmon's conviction, and we find no error which would require reversal. Accordingly, the conviction for first-degree murder is affirmed.

Penalty Phase
With respect to his sentence, Harmon challenges the trial judge's findings as to the four aggravating circumstances and claims the trial judge erred in summarily concluding that no mitigating circumstances were present. Harmon contends the death sentence must therefore be vacated, in light of the jury's recommendation of life.[6]
The first aggravating circumstance found applicable was section 921.141(5)(b), Florida Statutes (1985), that Harmon was previously convicted of a felony which involved the use or threat of violence to another person. Harmon contends the trial judge erroneously considered Harmon's admission to Dr. Poetter, who interviewed him at the request of defense counsel, that he had actually been convicted of five counts of armed robbery. This statement was contained in a written report filed with the court. The trial judge stated that this aggravating circumstance was "proved by introduction of certified copies of Judgement and Sentence from the State of South Carolina that on January 21, 1969, the defendant, JAMES ANSEL HARMON, was convicted of the offense of Armed Robbery." Accordingly, this factor was applicable beyond a reasonable doubt. The trial court's reference to the statement contained in the doctor's report was unnecessary to this finding. We hold that the trial court properly applied this aggravating factor.
Harmon argues that the trial judge's finding that the capital felony was committed for pecuniary gain, section 921.141(5)(f), Florida Statutes (1985), is not supported by the evidence. We disagree. Shadle testified that Harmon told him that he and Bennett were "robbing the guy" and that he shot the victim because Bennett mentioned his last name. The victim's son testified that the victim had between $2,500 and $5,000 in the house before his death. In addition, there was testimony that Harmon knew the victim had a significant amount of cash in the house with him and that Harmon's previous request to borrow this money from the victim had been denied. The victim's wallet was never located. *188 Bennett testified Harmon took the wallet, removed the cash, and then disposed of the wallet on the return trip to South Carolina. This evidence is sufficient to support a finding that the murder was committed for pecuniary gain. See Eutzy v. State, 458 So.2d 755, 758 (Fla. 1984), cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985).
The third aggravating circumstance found by the trial court was that the capital felony was committed in a cold, calculated and premeditated manner, section 921.141(5)(i), Florida Statutes (1985). In support of this finding, the court stated the facts as follows:
[I]t is clear that the defendant, JAMES ANSEL HARMON, traveled from South Carolina to the residence in Marion County, Florida, where the defendant knew the victim would be alone, with the clear intention of killing the victim, and that the defendant in fact shot the victim through the head at close range from behind, in a manner the court characterizes as an execution of the victim.
This Court has held that this aggravating factor applies to murders which are characterized as execution murders, contract murders, or witness elimination murders, though this description is not intended to be all inclusive. See Herring v. State, 446 So.2d 1049, 1057 (Fla.), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984). This circumstance can also be found when the facts show a substantial period of reflection and thought by the killer. Preston v. State, 444 So.2d 939, 946 (Fla. 1984). A heightened premeditation, greater than that level of premeditation required to be proven during the guilt phase of the murder trial, is required for the application of this circumstance. Id.
We agree with Harmon's contention that this factor was improperly found by the trial court. This murder occurred during the commission of a robbery and is susceptible to conclusions other than finding it was committed in a cold, calculated, and premeditated manner. Bennett testified that Harmon did not mention killing any one during the trip from South Carolina to Florida. In addition, Harmon's cellmate testified that Harmon stated that in the course of robbing the victim, Bennett spoke his name and he became frightened. The evidence does not establish this factor beyond a reasonable doubt. See Peavy v. State, 442 So.2d 200 (Fla. 1983).
The final aggravating factor found by the trial court was that the capital felony was committed in order to avoid a lawful arrest, section 921.141(5)(e), Florida Statutes (1985). The trial court properly applied this aggravating factor. As stated by the trial court in its in findings, "the victim, Charles O. Germany, was almost 69 years of age, legally blind and in ill health and the robbery could easily have been accomplished without killing the victim." The victim knew both Harmon and Bennett well and could easily have identified them. Furthermore, Harmon stated to his cellmate that he shot the victim after Bennett spoke his name, indicating that the victim would have been able to identify him. See Clark v. State, 443 So.2d 973, 977 (Fla. 1983), cert. denied, 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 356 (1984); Riley v. State, 366 So.2d 19 (Fla. 1978).
Therefore, we hold that the trial court properly found three aggravating circumstances to be applicable. The aggravating circumstance that the capital felony was committed in a cold, calculated, and premeditated manner was not established beyond a reasonable doubt and the trial court erred in finding the existence of this factor. We now turn to the issue of mitigating circumstances of which the trial court found none to be applicable.
Harmon contends that the trial court erred in sentencing him to death for the murder of Charles Germany when the jury recommended a sentence of life imprisonment. Harmon argues that the override violates the standard set forth in Tedder v. State, 322 So.2d 908 (Fla. 1975). The principle enunciated in Tedder, that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable *189 person could differ," id. at 910, has been consistently interpreted by this Court to mean that when there is a reasonable basis in the record to support a jury's recommendation of life, an override is improper. See Ferry v. State, 507 So.2d 1373, 1376 (Fla. 1987). "When there are valid mitigating factors discernible from the record upon which the jury could have based its recommendation an override may not be warranted." Id.
Harmon argues the jury could have relied on numerous nonstatutory mitigating circumstances presented during the penalty phase of the trial, including testimony that he was a good father as well as a good son, that he was a model prisoner prior to trial and acted as arbiter in several disputes between other inmates, and that he could contribute to society. The psychiatrist also testified that Harmon was a religious man who attended church regularly until 1976 and that he was an intelligent person. It would not be reasonable for a jury to recommend a sentence of life based only upon the evidence presented regarding these non-statutory mitigating factors standing alone.
Of more consequence is Harmon's contention that the jury could have based its life recommendation, in part, on their questioning of the respective roles of Harmon and Bennett in the murder and the disparity in treatment between the two if Harmon were sentenced to death. Although Bennett testified that he thought they might be going to commit a robbery, he denied having any knowledge that they were traveling to the victim's home or that Harmon was going to kill someone. He also denied having any part in the robbery of the victim. Shadle testified that Harmon informed him that both he and Bennett were involved in the robbery. Furthermore, Harmon took the stand and testified in his own defense. Harmon stated that during the time he supposedly was traveling to Florida with Bennett, he remained in South Carolina and helped a friend find a part for an appliance, sat at the kitchen table for a while by himself, and then got in the car and drove to a restaurant to get something to eat. After this, he stated that he drove around by himself, thinking about a personal problem, and did not return until between 3:00 and 5:00 the next morning. He testified that he had not seen Bennett since the prior evening when he was helping find the part for the friend, that he next saw Bennett the late afternoon of the day the murder occurred and that when he arrived Bennett looked like he had been drunk, "like he'd been out partying all night."
Bennett testified that during the trip to Arizona after the murder, he had numerous opportunities to part company with Harmon but did not due to his alleged fear of Harmon. Harmon testified that Bennett did not separate from him until Harmon made known his intention to return to Florida and try to clear himself from charges. Bennett pled guilty to second-degree murder. The jury was aware that, pursuant to his plea agreement with the state, Bennett would be sentenced to a maximum of seventeen years, with a lesser sentence possible.
This Court has recognized that "the degree of participation and relative culpability of an accomplice or joint perpetrator, together with any disparity of the treatment received by such accomplice as compared with that of the capital offender being sentenced, are proper factors to be taken into consideration in the sentencing decision." Craig, 510 So.2d at 870. We find, based on a review of the record, that the jury could have reasonably questioned the degree of participation by Bennett in the murder, together with the disparity between the maximum sentence possible for Bennett (seventeen years) and a recommendation of death for Harmon. See Malloy v. State, 382 So.2d 1190 (Fla. 1979). Compare Eutzy, 458 So.2d 755 (argument that jury's recommendation of life could reasonably have been based on the disparate treatment of witness and appellant rejected where record was devoid of any evidence which would show that witness was a principal in the first degree).
Reasonable people could conclude that the mitigating factors presented, the disparate treatment of Harmon in comparison with Bennett viewed in conjunction with *190 the nonstatutory mitigating factors set forth in the testimony of the psychiatrist, outweigh the proven aggravating factors. Because the facts are not so clear and convincing that no reasonable person could differ that death was the appropriate penalty, the trial court erred in overriding the jury recommendation of life. Amazon v. State, 487 So.2d 8, 13 (Fla.), cert. denied, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986).
Accordingly, we affirm Harmon's conviction, but vacate his sentence of death and remand for the imposition of a life sentence in accordance with the jury's recommendation.
It is so ordered.
OVERTON, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
McDONALD, C.J., concurs in the guilt, but dissents from the penalty.
NOTES
[1] § 921.141(5)(b), Fla. Stat. (1985).
[2] § 921.141(5)(f), Fla. Stat. (1985).
[3] § 921.141(5)(i), Fla. Stat. (1985).
[4] § 921.141(5)(e), Fla. Stat. (1985).
[5] We find Harmon's arguments regarding the following issues to be meritless: (1) admission of testimony by Stephen Germany and Keith Gauger alleged to be impermissible hearsay; and (2) alleged erroneous refusal to recess trial for the evening.
[6] We reject Harmon's argument that Florida's capital sentencing statute is unconstitutional on its face and as applied. As Harmon concedes in his brief, this Court has previously rejected these challenges. See Ferguson v. State, 417 So.2d 639 (Fla. 1982); Foster v. State, 369 So.2d 928 (Fla. 1979), cert. denied, 444 U.S. 885, 100 S.Ct. 178, 62 L.Ed.2d 116 (1979); Alvord v. State, 322 So.2d 533 (Fla. 1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976).