WENTWORTH, Judge.
Appellant Stokes seeks review of a 1/7/88 judgment entered pursuant to a jury verdict in the circuit court for Santa Rosa County, by which she was convicted of second degree murder with a deadly weapon and sentenced to 17 years. We reverse because the court erred in denying appellant s motion to suppress statements and physical evidence, and in permitting the state to introduce evidence attacking appellant’s character when she did not testify and her character was not in issue.
The charges stemmed from the 4/26/87 stabbing and drowning of 15-year-old Amy Michelle Turner in the swimming pool at her family residence. Appellant, age 17, that day gave a recorded statement to the Santa Rosa County Sheriff’s Department indicating that she had visited Turner’s home that morning. Appellant initially was interviewed by police because she had identified herself as one of the last persons to see Turner alive. At that time, appellant was not a suspect and she was given no Miranda warnings prior to being interviewed. Because appellant’s initial statement was inconsistent with known facts, the deputies interviewed appellant a second time at approximately midnight in the presence of her father and Wayne Barnes of the Division of Youth Services, HRS.
Prior to being interviewed for the second time appellant was advised of her rights, and at the beginning of her second recorded statement she signed a rights waiver form. That recorded statement, in which appellant stated that she had stabbed Turner in self-defense, was taken at approximately 12:45 a.m., concluding at approximately 1:10 a.m. At the conclusion of the second recorded statement, sheriff’s deputies continued to question appellant and elicited a third statement in which appellant stated she had stabbed and drowned Turner after a dispute regarding Turner’s boyfriend. Prior to giving the third statement, appellant was readvised of her rights. The third statement was taken at approximately 1:45 a.m., concluding at approximately 1:50 a.m. on 4/27/87. Present at that time were Sgt. Steve Collier, Sheriff Maurice Coffman, Jr., Wayne Barnes, and Assistant State Attorney John Spencer. Following the third recorded statement, appellant was further questioned and permission was obtained for the sheriff’s department to search her boyfriend’s residence to take custody of clothing she was allegedly wearing at the time of the crime. Appel *644 lant signed a consent to search form, and a search of the residence was begun at 2:31 a.m. with appellant present. Appellant directed the officers to clothing in a basket in the bathroom of the residence, and the clothing was seized. While appellant was being transported to the county jail, Sgt. Larry Bryant initiated another conversation with appellant, and appellant responded to the officer’s questioning, providing additional information. On 5/12/87, after appellant was indicted on a charge of first degree murder, Sgt. Collier again questioned appellant. He advised appellant that she had the right to have an attorney present while being questioned, but when she asked Collier where her attorney was, he responded that the attorney would not be present during that interview.
Appellant moved to suppress the statements given to the police, alleging that they were the result of an involuntary waiver of her rights, coercion, and/or obtained after she exercised her right to remain silent. She also moved to suppress all physical evidence seized, contending her consent to the search was tainted by the prior illegalities. Appellant alleged that she was questioned while under extreme emotional distress and was unable to fully understand her right to consult an attorney, to remain silent, and to cease answering the questioning by authorities. She further alleged that during questioning she indicated she no longer wished to answer questions, and this request was not honored, and that the consent to search was a coerced product of the continuing questioning, or an acquiescence to police authority.
At the hearing on the motion, Sgt. Collier was the state’s sole witness. He testified that he had no reason to suspect appellant was involved in the murder when she arrived at the police station accompanied by her father and stepmother around 9:49 p.m. on 4/26/87. He and investigator Larry Bryant talked to appellant’s father and then interviewed appellant, as above, recounted.
Appellant’s father, Mr. Stokes, testified that he escorted his daughter to the sheriffs department and remembered commenting to officers that he wondered if his daughter had committed the crime. He stated the interview room was crowded, small, and smoky. He stated that during the interrogation appellant indicated, prior to any taping, that she wanted to go home. Stokes testified that he was never told he was free to leave, and believed that he could not leave; that he remembered Sheriff Coffman talking to appellant and telling her: “Baby, don’t worry about it, you know. Just go ahead and tell us what you know and don’t worry about it. And if you did, just put yourself somewhere where you can get yourself a good education.” Stokes stated that he “pressured” his daughter to talk because he was tired and wanted to go home; that appellant looked exhausted during the interviewing, and was not allowed to have food. He testified that appellant had quit school, been married and divorced, and had come back to live with him and his wife, subsequently moving into a trailer in their back yard.
On rebuttal, Sheriff Coffman testified that he did not indicate to appellant or her father that she would receive a lenient sentence. He stated that after the arrest he told Mr. Stokes, as a consoling gesture, that his daughter might be able to get vocational training in prison.
The trial court denied the motion to suppress except as to the statement taken after appellant was indicted and had been provided counsel.
A jury trial was held 10/26/87. Among the numerous witnesses, Gloria Mae Murray testified that she was in the Santa Rosa County Jail and shared a cell with appellant in May and June 1987. Murray testified that appellant stated that she was jealous of Amy because Amy had a mother and she did not; that on the day of the crime she and Amy got into a fight; that at one time Amy had four or five hundred dollars for the purchase of cocaine; and that she stabbed Amy several times and then held her under the water until she drowned. Murray stated that she was testifying against appellant in hope that a judge would terminate her probation so that she could leave Florida.
*645 The court allowed correspondence between appellant and Murray to be introduced in evidence. In the letters, appellant wrote that she was having sexual relations while in jail, had been “mooning” male individuals while in the jail, intended to steal a watch from a cellmate, and planned to cry at her trial to get the sympathy of the jury. Appellant related in the letters that, “I was reading the newspaper, and it said that the little 14 year old boy would have gotten off if he would have cried just one time. So I guess, you know, I am going to cry my eyes out. I will try to make the jury feel sorry for me.” The defense moved for judgment of acquittal, which was denied.
The jury found appellant guilty of the lesser offense of second degree murder and not guilty of robbery. After a motion for new trial was submitted and denied, appellant was adjudicated guilty and sentenced to 17 years imprisonment.
In Miranda v. Arizona, 384 U.S. 436, 473-474, 86 S.Ct. 1602, 1627-28,16 L.Ed.2d 694, 723 (1966), the court stated:
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes this privilege cannot be other than the product of compulsion, subtle or otherwise.
In Fare v. Michael C, 442 U.S. 707, 724-725, 99 S.Ct. 2560, 2571-72, 61 L.Ed.2d 197 (1979), the court stated:
... the determination whether the statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent....
Appellant argues that, during her second recorded statement when the officer questioned her account of stabbing the victim in self defense, the following exchanges clearly indicated she did not wish to continue to be interrogated:
MR. BRYANT: Okay, you said she—
MS. STOKES: Daddy, I can’t handle no more of this.
MR. BRYANT: Okay, you said she moved around, did she try to get back up or—
Appellant responded to several further questions, at which point she again protested:
MR. BRYANT: Then what did you do?
MS. STOKES: I went upstairs and got a towel, wet it, got the blood off.
MR. STOKES: Go ahead and tell them about it.
MS. STOKES: No, daddy.
MR. STOKES: Go on, go on. Get it out.
MR. COLLIER: You got the towel.
MS. STOKES: I wet it and got, got the blood off the floor....
The trial court found that the statement by appellant first above quoted, beginning “Daddy,” was not directed to the officers, was not spoken in such a way to suggest that everyone in the room could understand what she said, and, in fact, could not readily be understood on the tape of the interview.
We are unable to agree, upon thorough evaluation of the tapes and transcript, that the critical statement was truly obscure or more difficult to understand than appellant’s other responses throughout the highly emotional interview. Appellee’s brief does not argue that the statement was inaudible to the interrogators, nor that it was unintelligible or insufficient to express a request to stop the questioning. The contention, instead, is that the accused did not make known to her interrogators her desire to stop the questioning, since she uttered her statement to her father and he did not convey or repeat the message. That fact does not, under the circumstances described, affect the obligation of the officers to limit inquiry at that point to a clarification of any doubt presented by the request, which was uttered in their presence and in response to their interroga *646 tion.[1] As held in State v. Wininger, 427 So.2d 1114 (Fla. 3d DCA 1983), where the statement from defendant in the course of interrogation was “I want to go home,” we conclude that:
... the sole issue before us is whether the defendant’s words ... indicated in any manner that the defendant wished to invoke his right to remain silent.... The request was, at the least, an indication in some manner that the defendant did not want to answer further questions. 427 So.2d 1115.
The questioning following appellant’s statement in this case was plainly not limited to clarification of ambiguity, if any, in appellant’s declaration. Her ensuing statements and evidence obtained as a result of such interrogation should therefore have been excluded upon motion to suppress herein. Cf. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313; Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Walton v. State, 481 So.2d 1197 (Fla.1985).
With respect to the second stated issue on appeal, the trial court allowed introduction of the letters written by appellant to witness Gloria Mae Murray to corroborate the testimony of Gloria Murray as to the closeness and character of the relationship between appellant and Murray, and to explain , why appellant would have confided in her concerning the crime. Appellant did not testify at trial and her character was not at issue. Section 90.404, Florida Statutes, provides that “evidence of a person’s character or a trait of his character is inadmissible to prove that he acted in conformity with it on a particular occasion, except: ... evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the trait.”
Gloria Murray testified that she and appellant were cellmates and had developed a close friendship. She also testified as to why she was willing to testify in appellant’s case. The letters detailing appellant’s behavior would appear only marginally to have corroborated Gloria Murray’s testimony or to have further established the closeness and character of the relationship between the two. The letters do impact on appellant’s character, and do not appear to be relevant to any issues at trial. In Harmon v. State, 527 So.2d 182 (Fla. 1988), the court found that introduction of testimony by the defendant’s cellmate that the defendant had asked him to pick up some stolen diamonds, and sell them after the cellmate’s release from prison, was relevant to “demonstrate the trust relationship that had developed between Harmon and Shadle and to provide the context in which Harmon’s admission of the murder was made to Shadle and was therefore admissible.” Harmon at 186. The state-' ments made by appellant in her letters in this case provide far less an indication of a trusting relationship with Murray. We conclude they are not within the Harmon rationale and should have been excluded. Counsel for the state is to be commended for having effectively so conceded at oral argument before this court. Because we reverse for new trial on the ground first above discussed we need not consider whether harmless error doctrines should or should not apply with respect to the error in admitting the latter evidence.
Reversed.
ERVIN and ZEHMER, JJ., concur.

. Testimony of the interrogating officer was:
Q. And you heard the utterances that I am referring to when Connie talked to her father and her father advised her to continue talking?
A. Correct.
Q. And did you at any time when Connie made the statements ... did you advise, ask Connie if she wished to continue?
A. No, sir.
Q. You kept on taking the statement?