529 So.2d 1088 (1988)
Herbert Lander SPIVEY, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 67010.
Supreme Court of Florida.
July 14, 1988.
Rehearing Denied September 23, 1988.
*1089 Michael E. Allen, Public Defender and David A. Davis, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Patricia Conners, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Herbert Spivey, Jr. appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction but remand for the imposition of a life sentence without eligibility of parole for twenty-five years.
Spivey and his codefendant, Crofton, were charged with conspiracy to commit murder in the first-degree and with the first-degree murder of Crofton's husband. Spivey was also charged with robbery.[1] The jury returned verdicts finding Spivey guilty of all charges and Crofton guilty only of conspiracy to commit murder. The evidence at trial showed the following. Crofton decided to have her estranged husband murdered. On her own, and through an acquaintance, Ellison, she set out to hire someone to commit the murder. She contacted a relative and offered $20,000 for the murder and, through Ellison, made the same offer to a petty criminal, McDonald. Neither solicitation was successful but it appears that McDonald accepted some money up front prior to his arrest and jailing on an unrelated charge. Ellison, *1090 who was himself an illegal drug dealer, focused his attention on Spivey who had a pregnant wife, no visible means of support, and a drug habit. Using money provided by Crofton, Ellison gave Spivey up-front money, bought him a car, and promised him the ubiquitous $20,000 for committing the murder. Crofton's and Ellison's plan was to disguise the premeditated murder as a felony (robbery) murder. Spivey was told that the victim normally carried large sums of cash on his person, which Spivey could keep as an additional bonus. Ellison, using information provided by Crofton, briefed Spivey on the victim's habits, his residence, his place of business, his hangouts, his car, and provided him with a photograph of the victim. Ellison also gave Spivey guided tours to show him where he could locate the victim at opportune times. On the afternoon of the murder, Spivey and his wife set out in search of the victim. En route, Spivey enlisted two male acquaintances, Ouchida and Hawkins, to assist him in a purported robbery. Spivey also received up-to-the-moment intelligence from Ellison that the victim had visited his estranged wife and left with a large sum of cash. Spivey and company located the victim's car, followed the victim home where Spivey gave one of his cohorts a gun, and the three men entered the victim's home. Using the gun and physical force, the three men subdued the victim and took a small amount of cash and other valuables from him. Using a large pillow case obtained from the victim's bedroom by Spivey, the victim was strangled to death. The medical examiner testified that the victim suffered from advanced emphysema and that the strangulation would have quickly caused ruptures in the lungs and death. The victim was left dead or dying on the floor and Spivey and Ouchida left the scene in Spivey's automobile. They were joined in a few minutes by Hawkins driving the victim's vehicle. The victim's vehicle was then abandoned some distance from the home in order to delay discovery of the crime. Later that night, Spivey reported the death to Ellison and, in the ensuing months, received approximately $17,500 in payment for the murder. Approximately $4,000 of this sum was paid to Hawkins for his role in the murder. However, Ouchida told a friend about the robbery-murder and this friend told the police. Ouchida was given immunity and Ellison and Hawkins were allowed to plead guilty to second-degree murder charges. All three testified for the state.
Spivey raises only two issues on appeal. The first concerns the conviction itself. Spivey took the stand in his own behalf. In his testimony, he admitted participating in the conspiracy to murder but claimed that he never intended to commit the murder; he only intended to commit a robbery. He admitted soliciting the help of Hawkins and Ouchida in committing the robbery, neither of whom knew the victim; he admitted providing the gun and driving the robbers to the victim's home; he admitted entering the home and participating in the robbery; and he admitted obtaining the pillow case used for the strangulation. However, he denied that he strangled the victim, contrary to Hawkins' and Ouchida's testimony, and testified that the victim was alive when he and Ouchida left the home. Following this testimony, Crofton's defense counsel cross-examined Spivey in an attempt to show that his testimony concerning the conspiracy was a recent fabrication. Over objection of Spivey's counsel,[2] Crofton's counsel was permitted to question Spivey as follows concerning his post-arrest Miranda[3] silence.
Q At the time that you were arrested did you make any statement to anybody at that time?
[Spivey Counsel]: I object, Your Honor.
THE COURT: All right, sir. Overruled.
A No, sir, I didn't.
Q You didn't say anything?

*1091 [Spivey Counsel]: I object and move for a mistrial.
THE COURT: I will overrule the objection.
Q Did you tell anybody at that time that you had been involved in the killing of Mr. Crofton?
A No, sir, I hadn't.
Q Did you tell anybody at that time that you had been contacted by Mr. Ellison to do a contract murder?
A No, sir.
Q Did you tell anybody at that time that you had ever heard anything about Mickey Finch, or Mickey?
A No, sir.
Q When was the first time  Did you ask for a lawyer?
A Excuse me, sir.
Q Did you ask for a lawyer at that time?
A No, sir.
Q Did you ever thereafter ask for a lawyer?
A Yes, sir.
Q When was that?
A In Court, sir, when I came to a bond hearing.
Q How long after?
A The next day.
[Spivey Counsel]: Once again, I object, Your Honor.
THE COURT: All right.
[Spivey Counsel]: May I ask for a continuing objection?
THE COURT: Yes, sir, and that will be overruled.
Q When was the first time that you ever told anybody the story that you told here today with regard to the contract and Mickey. And those things?
A The first day I seen my lawyer.
Q When was that sir?
A Approximately four days after my arrest.
Q Did you tell anybody else?
A No sir.
Q Did you ever tell a law enforcement officer any such thing.
A No, sir.
... .
Q Did you ever talk to anybody about the matter of how this murder had occurred?
A No, sir, because I didn't kill anybody.
In permitting this questioning relative to Spivey's post-arrest Miranda silence, the trial court reasoned that it was necessary to balance Crofton's sixth amendment right of confrontation against Spivey's right under Miranda not to have his post-arrest silence used against him at trial. Spivey urges that this ruling was in error for two reasons. First, assuming that Crofton had a sixth amendment right to cross-examine on post-arrest silence, it was error to balance one defendant's right against another's. In Spivey's view, his rights were violated contrary to Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and, if those rights were inconsistent with Crofton's rights, Crofton's trial should have been severed and the defendants tried separately. Second, Spivey urges, Crofton's counsel should not have been permitted to bring out Spivey's post-arrest Miranda silence because such silence has no probative value and is, thus, irrelevant. For the reasons which follow, we agree that it was error to permit Crofton's counsel to cross-examine Spivey on his post-arrest Miranda silence.
The Miranda rights were established as a prophylactic rule to minimize the coercive atmosphere of custodial interrogation by law enforcement officers. The rule prohibits the use by the state of any statement, whether exculpatory or inculpatory, obtained in a custodial setting unless the procedural safeguards of Miranda are followed. Moreover, "[t]he prosecution may not ... use at trial the fact that he stood mute or claimed his privilege in the face of accusation." Miranda, 384 U.S. at 468 n. 37, 86 S.Ct. 1624-25 n. 37. Miranda, however, is addressed to the actions of the state and its agents. Thus, by its terms, Miranda is not applicable to the actions of counsel for Crofton and we cannot say that Miranda or its progeny have been directly violated. See also Colorado *1092 v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (coercive activity by the state is a necessary predicate to finding that a confession is involuntary).
Our conclusion that Miranda itself has not been violated does not end our inquiry. Prior to Miranda, it could be plausibly argued that silence in the face of an accusation was probative evidence which the jury could weigh in determining guilt or innocence. We so held in Albano v. State, 89 So.2d 342, 344 (Fla. 1956):
[T]his court has committed itself to the rule that when one in custody accused of a crime has full liberty to speak and remains silent in the presence of accusations of his guilt, then evidence of such silence may be considered with other facts and circumstances established by the evidence as tending to show guilt. While silence alone certainly raises no legal presumption of guilt, its effect is for the jury which under proper instructions may consider it in connection with other facts and circumstances as some evidence of guilt. See Autrey v. State, 94 Fla. 229, 114 So. 244.
Miranda has changed this former rule of evidence: post-arrest silence is no longer treated as a prior inconsistent statement and cannot be used for impeachment purposes when a defendant takes the stand. The reason for this is twofold:
Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See United States v. Hale, supra, 422 U.S., at 177, 95 S.Ct., at 2137. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.
Doyle, 426 U.S. at 617-18, 96 S.Ct. at 2244-45 (footnotes omitted). See also United States v. Hale, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975), where the Court spoke directly to the value of post-arrest silence for impeachment.
But the situation of an arrestee is very different, for he is under no duty to speak and, as in this case, has ordinarily been advised by government authorities only moments earlier that he has a right to remain silent, and that anything he does say can and will be used against him in court.
... .
Under these circumstances, his failure to offer an explanation during the custodial interrogation can as easily be taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication. There is simply nothing to indicate which interpretation is more probably correct.
Id. at 176-77, 95 S.Ct. at 2136-37. Applying Doyle and Hale in a different factual situation, this Court reached the same conclusion: post-arrest silence has no probative value as evidence.
Regardless of the nature of the defense raised, the evidentiary doctrine in Hale remains intact. Post-arrest, post-Miranda silence is deemed to have dubious probative value by reason of the many and ambiguous explanations for such silence. 422 U.S. at 180, 95 S.Ct. at 2138. Contrary to what Greenfield [v. State, 337 So.2d 1021 (Fla.2d DCA 1976)] intimates, these ambiguities attendant to post-Miranda silence do not suddenly disappear when an arrestee's mental condition is brought into issue. The same evidentiary problems addressed by the Supreme Court in Hale are present in the case before us. For example, one could reasonably conclude that custodial interrogation might intimidate a mentally unstable person into silence. Likewise, an emotionally disturbed person could be reasonably thought to rely on the assurances given during a Miranda warning and thereafter choose to remain silent. In sum, just what induces post-arrest, *1093 post-Miranda silence remains as much a mystery today as it did at the time of the Hale decision. Silence in the face of accusation is an enigma and should not be determinative of one's mental condition just as it is not determinative of one's guilt.
State v. Burwick, 442 So.2d 944, 948 (Fla. 1983), cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984).
It is clear from Doyle, Hale, and Burwick that post-arrest silence has very little, if any, probative value and that assigning a meaning to such silence would be an exercise in pure speculation. In the case at hand, as a matter of law, Spivey's post-arrest silence to the police was not probative on the question of whether he recently fabricated the testimony he gave at trial and it was error to permit Crofton's counsel to attempt to impeach Spivey's credibility by cross-examining him on this silence. In sum, Crofton's sixth amendment right of confrontation did not encompass the right to cross-examine Spivey on a nonprobative matter which tended to prejudice Spivey and to encourage the jury to speculate on his silence.
The state agrees that it was error to permit cross-examination on Spivey's post-arrest silence. Because of the critical importance of the issue to the orderly administration of justice, the state urges that we hold that neither the state nor a codefendant may cross-examine or otherwise comment on a defendant's silence. We agree and so hold. Such cross-examination or comment serves no legitimate purpose and permits codefendants to introduce potentially reversible error and to cause mistrials or severances at the expense of the rights of the other codefendants to fair and speedy trials and of the state to joint and speedy trials. The potential mischief in such tactics was recognized long ago by Judge Bell in De Luna v. United States, 308 F.2d 140, 156 (5th Cir.1962) (Bell, J., specially concurring).
The opinion of the majority will create an intolerable procedural problem. If Gomez, or others similarly situated, claims the right which the majority holds that he has to comment on the failure of de Luna to testify, a mistrial will be required at the instance of his co-defendant who did not take the stand. In addition, severance in advance of trial may be required where there is a representation to the court that one co-defendant does not expect to take the stand while another or others do expect to testify, and claim their right to comment upon the failure of the other to testify. This would eliminate joint trials, or vest in a defendant the right to a mistrial during final arguments, or in the alternative create built-in reversible error, all in the discretion of the defendants. The law contemplates no such end.
Having conceded that there was error, the state nevertheless urges three grounds for affirmance: first, that Spivey's counsel did not preserve the issue for appellate review by presenting the argument now urged on review; second, there was no state action in causing the error and thus Spivey's due process rights under the fourteenth amendment have not been violated; and, third, the error was harmless in view of Spivey's testimony, showing that he was guilty of first-degree felony murder. There is no merit in the first two arguments. The objection was examined at length out of the hearing of the jury and it was made clear to the trial court that the basis for the objection was the potentially prejudicial effect of cross-examination on post-arrest Miranda silence. Williams v. State, 414 So.2d 509, 511 (Fla. 1982); Castor v. State, 365 So.2d 701, 703 (Fla. 1978). On the question of state action under the fourteenth amendment, the initiation of a criminal trial is itself sufficient state action to implicate the fourteenth amendment. Cuyler v. Sullivan, 446 U.S. 335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980); State v. Meyer, 430 So.2d 440, 443 (Fla. 1983); Vagner v. Wainwright, 398 So.2d 448, 451 (Fla. 1981). But cf. Colorado v. Connelly.
The question of harmless error requires further examination. In State v. Diguilio, 491 So.2d 1129 (Fla. 1986), we recognized that comment on a suspect's post-arrest *1094 Miranda silence was subject to harmless error analysis under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Spivey was charged with first-degree murder and the jury was correctly instructed that a verdict of guilty could be grounded on either premeditation or felony (robbery) murder. The jury returned a verdict of guilty without specifying whether the verdict was based on one or both of the two grounds. The two key witnesses against Spivey under the theory of premeditation were Ellison, who testified that he hired and paid Spivey to commit the murder, and Hawkins, who testified that he shared in the money paid to Spivey to commit the murder. The testimony of these two witnesses was corroborated by the testimony of other witnesses and by documentary evidence. It is clear that Spivey's only hope of avoiding conviction as a contract killer under a premeditation theory, and a probable recommendation of death, was to persuade the jury that he did not intend to kill the victim and was not responsible for the murder. Accordingly, Spivey chose to take the stand. Spivey's testimony was largely inculpatory and confirmed the state's theory that he was the principal actor in a felony robbery which caused the death of the victim. His own testimony showed that he recruited Hawkins and Ouchida, provided the gun used in the robbery, drove the trio to the robbery-murder site, entered the home and helped to subdue the victim, and furnished the pillow case used to strangle the victim. He differed from the testimony of Ellison, Hawkins, and Ouchida only in testifying that he did not intend to kill the victim and that the victim was alive, albeit unconscious, when he left the home. Spivey was essentially attempting to present an Enmund[4] defense to a potential death sentence. Even if Spivey's testimony is accepted at face value, the jury would have been compelled to find guilt on a felony murder theory. Hawkins departed the scene in a matter of minutes driving the victim's car and rendezvoused with Spivey at a nearby location where the victim's car was abandoned. There is no evidence that Spivey abandoned or disassociated himself from the robbery itself and it is uncontroverted that the victim died from strangulation by one or more of the three robbers.
In his argument on whether the judge erred in overriding the jury recommendation of life, Spivey makes a point which bears on the first issue. Spivey argues that the only explanation for the jury's verdicts that Spivey and Crofton were both guilty of conspiracy to commit first-degree murder but that only Spivey was guilty of first-degree murder is that the jury found Spivey guilty of felony murder. We agree. The dissonant verdicts in this case stemmed from the instructions given to the jury and to an erroneous response to a question from the jury. The evidence at trial showed a conspiracy between Crofton, Ellison, and Spivey to commit a premeditated murder and to conceal the premeditation by disguising the murder as a felony (robbery) murder. In short, they premeditated a felony murder. At trial, the jury was instructed that Spivey could be convicted on either a premeditation or felony murder theory. However, in the case of Crofton, the jury was instructed that she could only be convicted on a theory of premeditation and could not be convicted on a felony murder theory. The jury was apparently troubled by these instructions limiting it to premeditated murder because, after long deliberation, it asked the court if the conscious intent to kill had to be in the mind of the defendant and/or the mind of the agent who did the actual killing. The jury was instructed that the conscious intent had to be in both the minds of the defendant and the agent. This misstatement of the law, contrary to the evidence at trial, effectively instructed the jury that Crofton should be found not guilty of murder if it found that codefendant Spivey had not intended to commit the felony murder.[5] After receiving this instruction in open court, the jury *1095 retired and within ten minutes returned with its verdicts: Spivey was found guilty of first-degree murder, conspiracy, and robbery; Crofton was found guilty of conspiracy to commit murder but not guilty of murder. It is apparent, as Spivey urges, that the jury found Spivey guilty of felony murder, not premeditated murder, and that it believed his testimony that he was not a contract killer.
Under the circumstances above, and based on our review of the record, we conclude that the error of permitting cross-examination on Spivey's post-arrest Miranda silence was harmless. Contrary to Spivey's argument that the cross-examination prejudicially affected his credibility as a witness, it is clear that the jury found Spivey credible and accepted his disclaimer of intent to murder. What it could not accept, given the evidence from his own mouth, was his counsel's argument that Spivey was not guilty of felony murder. For purposes of reviewing the conviction only, it matters not that Spivey was guilty of felony murder but not premeditated murder.
Spivey's final point is that the judge erred in overriding the jury's recommendation of life. In overriding the jury recommendation, the judge found two aggravating circumstances: Spivey had been previously convicted of a felony involving the use or threat of violence, section 921.141(5)(b), Florida Statutes (1983); and Spivey committed the murder for pecuniary gain of $20,000, section 921.141(5)(f). The judge found nonstatutory mitigation in Spivey's impoverished condition, his deprived childhood, and the fact that Hawkins and Ellison plea bargained for life sentences, Ouchida received immunity, and Crofton was found guilty of conspiracy to murder but not guilty of murder. The judge concluded that the two aggravating circumstances outweighed the mitigating circumstances.
Spivey first urges that the judge erred in weighing aggravating circumstances when the jury had recommended life. In Spivey's view, Tedder v. State, 322 So.2d 908 (Fla. 1975), requires that a trial court limit its consideration to determining whether there is a reasonable basis for the jury's recommendation without examining the aggravating and mitigating circumstances. It is not clear to us how a judge could determine whether there was a reasonable basis for the jury's recommendation without examining the aggravating and mitigating circumstances. We reject the proposition that aggravation and mitigation are irrelevant under Tedder. We agree, however, that there was a reasonable basis for the jury's recommendation and that the judge erred in imposing death.
We begin our analysis by noting that our basis for affirming Spivey's conviction is that the jury believed his disclaimer of intent to kill and found him guilty of felony murder. There was a reasonable basis for the jury to believe that Spivey did not commit a contract murder. Thus, the second aggravating circumstance is invalid and we are left with a single aggravating factor and multiple mitigating circumstances. We are persuaded that there was a reasonable basis for the jury's recommendation of life imprisonment. The record shows that Crofton and Ellison were the primary motivators in this murder. They furnished the money, the planning, and the wherewithal to commit the murder. Without Crofton and Ellison, there would have been no murder or robbery or even any contemplation of murder or robbery. The jury could have concluded that Crofton and Ellison were the principal actors in this despicable crime and that it would be a miscarriage of justice to impose death on Spivey, whose role was less critical, while Crofton and Ellison received sentences of considerably less severity.
We affirm the convictions but reverse the death penalty with instructions that life imprisonment without eligibility for parole for twenty-five years be imposed. We leave to the trial court the question of whether this sentence will be served concurrently or consecutively to the other sentences imposed.
It is so ordered.
*1096 OVERTON, McDONALD, SHAW and BARKETT, JJ., concur.
EHRLICH, C.J., concurs in the result only as to conviction and dissents as to sentence with an opinion.
EHRLICH, Chief Justice, concurring in result only as to conviction and dissenting as to sentence.
The indictment charged that Spivey "did unlawfully and from a premeditated design to effect the death of Ronald Crofton, a human being, did kill the said Ronald Crofton by means of strangulation, contrary to the provisions of section 782.04(1)(a), Florida Statutes." In its verdict the jury found the defendant guilty of murder in the first degree, as charged in the indictment. These are the facts, but instead of accepting the verdict as rendered, the Court chooses to amble in a thicket of speculation as to the process of ratiocination of the jury in arriving at its verdict. It has been my personal experience and my observation that it is an impossible chore to try and figure out on what basis or why a jury returned the verdict that it did. And yet, this is precisely what the Court has done and hinges its bottom line on this synthesis. I believe this analysis is neither reasonable nor proper.
It is clear from all the evidence except Mrs. Crofton's that $20,000 was to be paid for the death of Mr. Crofton. In addition to this sum, defendant was to keep whatever money was found on Mr. Crofton, and it was suggested that at that particular time Mr. Crofton had about $20,000 on his person. As it developed, the victim only had $68, and the robbers promptly spent it on drugs.
Defendant called Ellison after the killing and reported the job had been done and Ellison likewise reported that fact to Mrs. Crofton. Defendant and others were checking the newspapers for an account of the fact of Mr. Crofton's death. Why this interest in Mr. Crofton's death except for the fact that defendant had intended to kill in order to collect the $20,000? It was not the defendant's intent merely to rob Mr. Crofton. That would not have produced the $20,000 bounty. In order to obtain the fringe benefit of taking whatever money Mr. Crofton had on his person at that time, defendant and his cohorts proceeded to rob the man in the course of killing him. Defendant would thus be entitled to $20,000 plus whatever amount was produced in the robbery. This scenario had the added benefit of making the whole thing appear to be a murder incident to robbery rather than a husband elimination.
I cannot accept the view that the jury found Spivey creditable and accepted his disclaimer of intent to murder. It was defendant who got the pillow case and choked the victim and who later asked Hawkins to lend him a helping hand trying to strangle Mr. Crofton. Mr. Crofton was previously subdued with the pistol and there was no need to strangle him, except to kill him. It is purely speculative at the very least in light of the totality of the facts to say that the jury believed defendant's disclaimer of intent to kill, and accordingly found him guilty of felony murder.
The Court says that "there was a reasonable basis for the jury to believe that Spivey did not commit a contract murder." Yet that is precisely what the evidence spells out. Spivey did not know the victim and it was not his idea initially to commit the murder. He was enticed into committing it for the sum of $20,000, and $17,500 actually passed hands, of which sum approximately $4,000 went to Hawkins for his role in the murder. The evidence is clear that the three robbers took from the victim whatever monies he had on him, approximately $68. Despite the fact that money was paid to Mr. Spivey for successfully carrying out what he was hired to do, and despite the fact that the robbers took what little money the victim had on him, the Court concludes that the second aggravating circumstance, that Spivey committed the murder for pecuniary gain of $20,000, is invalid. The evidence is overwhelming that Mr. Spivey's services to commit the murder were engaged for $20,000, and while only $17,500 was paid to him, nonetheless he received money for his dastardly *1097 deed. The aggravating circumstance provided by section 921.141(5)(f) would certainly be applicable as to the uncontradicted pecuniary benefit received by defendant.
I have difficulty in accepting the Court's characterization of defendant's role as "less critical" than that of Crofton and Ellison. By no stretch of the imagination can defendant's acts be considered less culpable than any of the others. True, someone else wanted to bring about Mr. Crofton's death and Mr. Ellison was the intermediary, but it was Spivey who enlisted the help of Ouchida and Hawkins to assist him in the staged robbery and killing Mr. Crofton so that he could collect $20,000. Defendant was a contract killer, pure and simple. He killed because he was hired to do so. That was his sole motive.
I do not accept the majority's premise that there was a reasonable basis in the record for the jury's rendering the verdict that it did. While the jury may very well have wanted to bestow a "jury pardon" on Mrs. Crofton, I do not believe that that is any basis to support its recommendation to the court. In my view, the trial judge, as the statutory sentencer, properly overrode the recommendation of the jury.
NOTES
[1] Spivey does not contest the convictions for conspiracy and robbery. Based on our review of the record, we affirm all convictions of Spivey.
[2] The state disassociated itself from the questioning and said it would have nothing to do with the questioning on Spivey's silence at the time of arrest.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
[5] The confusion surrounding the jury question and answer is illustrated by counsel for Crofton objecting to the answer and the state remaining silent!